Sedley K. PYNE, Appellant,

v.

JAMAICA NUTRITION HOLDINGS LIMITED, Appellee.

Dexter ROSE, Appellant,

v.

JAMAICA NUTRITION HOLDINGS LIMITED, Appellee.

Nos. 82–1634, 82–1635.

District of Columbia Court of Appeals.

Argued Sept. 13, 1984.

Decided Aug. 23, 1985.

120

Thomas G. Corcoran, Jr., Washington, D.C., for appellant Pyne.

Joseph F. Cunningham, Washington, D.C., with whom Ashley J. Gardner, Washington, D.C., was on the brief, for appellant Rose.

Jamie L. Whitten, Washington, D.C., for appellee.

Before MACK, TERRY and ROGERS, Associate Judges.

ROGERS, Associate Judge:

Appellants appeal the denial of motions for a new trial and appellant Pyne appeals the denial of a motion for judgment notwithstanding the verdict. A jury returned verdicts against them for fraud and breach of fiduciary duty as employees of appellee. Their principal contentions are (1) that the trial court erred in admitting into evidence (a) a settlement agreement between appellant Rose and appellee and (b) testimony relating to evidence produced by appellant Rose in connection with the settlement agreement, and (2) that without such evidence there was insufficient evidence of fraud and breach of fiduciary duty.[1] We hold that appellants waived any objection

---

1. Appellant Pyne also contends that the trial court erred in admitting hearsay testimony and unredacted documents which implicated him, and in allowing appellee to impeach Rose whom it called as its own witness and not giving an immediate cautionary instruction. Both appellants contend that the trial court erred in admitting evidence which was compelled in violation of Rose's Fifth Amendment privilege

against self-incrimination; in denying appellants' motion to set aside the verdicts as excessive and because there was insufficient evidence of malice to warrant submitting the issue of punitive damages to the jury; and in assessing punitive damages without regard to appellants' ability to pay. In view of our disposition we do not reach these issues.

to admission of the settlement agreement by failing to object to its admission but did not thereby waive their objection to the evidence produced pursuant to the settlement agreement. We further hold that it was error to admit the evidence produced pursuant to the settlement agreement. Nevertheless, because other evidence independently obtained by appellee was sufficient to prove appellants' liability by clear and convincing evidence, we affirm the judgments of liability. Although the independent evidence established that appellants had received secret commissions from shipping companies with whom they contracted on behalf of appellee, the inadmissible evidence affected the amount of damages assessed against appellants by the jury. Accordingly, we reverse and remand for a new trial on damages.

## I

Appellee, Jamaica Nutrition Holdings, Ltd. (the company) sued appellants Dexter Rose and Sedley Pyne on February 20, 1980, for fraud and breach of fiduciary duty. The complaint alleged that Rose, assisted by Pyne, had negotiated contracts in the District of Columbia on behalf of the company with shipping companies in 1975, 1976 and 1977 and thereafter had accepted secret commissions from the shipping companies without the company's knowledge or approval. Some of the commissions were allegedly deposited in bank accounts maintained by appellants in the District of Columbia, while others were deposited in the Swiss bank accounts of Young & Wilcox, a Liberian corporation established by Rose, and Structural Redevelopment, Incorporated, another Liberian corporation allegedly established by Pyne. The company sought a judgment against appellants, jointly and severally, for $273,195.00 in actual damages and one million dollars in punitive

damages; the actual damages were alleged to be the approximate amount paid in commissions by Agrobulk Shipping Corporation (Agrobulk).

The company, wholly owned by the Government of Jamaica, was established in 1973 to stabilize the cost of basic food items by buying directly and shipping in bulk from foreign suppliers. Dexter Rose became the company's first managing director and chief executive officer on March 1, 1974. He had authority to enter into contracts on behalf of the company, but all shipping contracts were subject to approval by the Board of Directors. Rose hired Sedley Pyne, a boyhood friend, in August 1974 as a procurement and commodities specialist to be in charge of the company's office in Washington, D.C. under Rose's supervision. Both Rose and Pyne were directors of the company. When the company learned of the secret commissions in January 1979, its Chairman and the Permanent Secretary of the Jamaican Ministry of Industry met with Rose and Pyne individually, and within a few days both were dismissed. The company, with the support of the Prime Minister and Cabinet of Jamaica, employed an investigating agency to review the company's books and records. Thereafter, lawsuits were filed against appellants and others.

On March 18, 1980, in the District of Columbia, Rose and the company executed a Memorandum of Agreement (Memorandum) which outlined the conditions under which the dispute between them could be settled. The company agreed not to seek Rose's extradition from the United States,[2] to grant, upon his request, immunity from any prosecution the Jamaican Government may institute, and to hold in abeyance any legal proceedings pending against him. Rose, in turn, agreed to "make full restitution of all sums of money claimed against

2. Rose testified that shortly after he was questioned by the company about the secret commissions, he came to the United States to speak with Harry Smith, the shipping agent who had advised him that it was an acceptable business practice to receive commissions. When Rose left Jamaica, he had been suspended from his position at the company, but while in the United States, he learned that he had been terminated permanently and his wife had been arrested. Fearing for his safety, he decided not to return to Jamaica.

him [in the instant lawsuit] and any other moneys and/or property which may have come into his possession improperly or in error in respect of contracts negotiated . . . [by] the [company]." He agreed to make immediate restitution of the sums claimed as actual damages in the instant lawsuit which were "[then] in his possession and [to] give a full and accurate account within 30 days of execution of the agreement, of all amounts which have been expended," and otherwise to cooperate fully with the company in investigating the matter. The parties were to agree to the method and time of repayment of expended amounts within seven days after Rose completed his accounting, and the instant lawsuit was to be held in abeyance for the period that Rose was given to comply with the agreement. The Memorandum was prepared by the company and signed by Rose, who was represented by counsel, and by the president of the company, the Jamaican Minister of Justice, and the Director of Public Prosecutions of Jamaica.

Thereafter, for seven days in March and April 1980, company investigators and various Jamaican government officials interviewed Rose about financial and contractual transactions during his tenure as managing director. The Jamaican Government later advised Rose, by letter of June 3, 1980, that he had breached the Memorandum by failing, within sixty days of its execution, to turn over the money in his Swiss and Chase Manhattan bank accounts. By letter of June 12, 1980, Rose's attorney objected to what he characterized as the unilateral attempt to abrogate the Memorandum and noted that although the Jamaican Government had failed to meet some of its obligations under the Memorandum, Rose had made every effort to cooperate and remained committed to cooperating ful-

ly. The Jamaican Government did not respond, but pursued the instant lawsuit.

At trial, the company's current managing director testified about the company's purpose, the contracts at issue as well as appellants' duties and employment contracts, which, in accordance with Jamaican law, prohibited the receipt of commissions. In testifying about the company's discovery of the secret commissions, he described the subsequent interviews with appellants by the company's Board of Directors: Rose had admitted receiving the commissions, owning Young & Wilcox and having an overseas bank account, but denied he had done anything wrong and claimed he used the corporation and bank account in connection with private consulting work. Pyne denied any wrongdoing and any connection with Young & Wilcox and Structural Redevelopment, Incorporated and claimed that the only money had had received from Rose was a personal loan. The Company's managing director also referred to a report from its shipping manager which concluded that the shipping companies were overcharging the company, and testified that once the secret commissions were discovered, the company ceased to do business with the shipping companies. Finally, he also testified that it is standard business practice for a shipper to pay a commission to the shipping agent responsible for chartering a vessel, and that the commission is not an additional payment, but is included in the price of using the vessel.

Also at trial, two investigators hired by the company testified about their activities and the information Rose had provided during the March and April 1980 interviews regarding the circumstances surrounding his receipt from 1975 to 1979 of $293,000 in secret commissions.[3] The Memorandum

3. Rose told the investigators that in negotiating contracts on behalf of the company, he had selected Agrobulk on three occasions to provide shipping and other specialized services for the company. This selection was based upon the recommendation of Harry Smith, an experienced shipper in the area with whose company, St. John's International, the company had contracted to provide general management for shipping activities. St. John's and Transatlantic Shipping Agency, Inc. acted as agents for Agrobulk. Smith had advised Rose that he could receive two and a half percent of the freight charges that the company would pay to Agro-

was admitted into evidence without objection. Documents the company had obtained from the Jamaican Government showed Rose's bank account activity at the Chase Manhattan Bank and the American Security Bank and were introduced without objection. Over Rose's objection, one investigator testified that the company had lost $3.7 million as a result of the secret commissions paid by Agrobulk. An accounting, in the form of an unsworn and unsigned affidavit, which the company obtained from the attorney for Agrobulk's shipping agent, *see supra* note 3, was also admitted into evidence over Rose's objection. It showed that between 1975 and 1977 Agrobulk had paid commissions of $239,162.03 to Rose and Young & Wilcox and $14,533.01 to Structural Redevelopment, Incorporated. The trial court ruled that Rose's confirmation of the accuracy of the affidavit, with the exception of the payments to Structural Redevelopment, Incor-

porated constituted an admission, and instructed the jury that the proposed affidavit was admissible only against Rose and inadmissible hearsay for any other purpose.[4]

The investigators recounted, over Pyne's objection, that Rose had told them that he had discussed the commission arrangement with Pyne and had agreed to give Pyne approximately fifty percent of the commissions.[5] The trial court instructed the jury that Rose's statements were admissible only against Rose. The investigators testified that when Pyne was interviewed, he acknowledged that he had received $10,500 from Rose, but claimed that it was a personal loan to purchase and repair a house, which he had partially repaid. According to the investigators, Pyne's subsequently obtained bank records revealed that he had received an additional $9,000 from Rose.

bulk for shipping freight to Jamaica. Although initially reluctant to accept the commissions, Rose said he was persuaded by Smith that they were a standard business practice. The first payment in April 1975 was in cash and a second payment was in the form of a check drawn on Agrobulk's account and signed by Smith, which Rose deposited in July 1975. After the second payment, Rose and Smith decided that these methods of payment were not "the best type of arrangement[s]," so, in 1975 Rose, on Smith's recommendation, formed Young & Wilcox with his wife. All subsequent payments to Rose by Agrobulk were made by check payable to Young & Wilcox. Initially, Young & Wilcox had established an account at the Chase Manhattan Bank, but later established an account at a bank in Basel, Switzerland, to which all future payments were made, using Smith's agent, Etienne Lanouline, as a conduit. Rose admitted that he had never informed the company about the commissions. Smith's attorney prepared an affidavit for Lanouline's signature which set forth all of the commissions paid by Agrobulk to Rose, Young & Wilcox and Structural Redevelopment, Inc.; Lanouline was an officer of Agrobulk and, according to Rose, a director of Young & Wilcox. He never signed the affidavit.

The investigators also testified that similar secret commissions from Continental Grain were shared by appellants and that Pyne had been subjected to an extortion attempt as a result of his receipt of these commissions.

When the company sought to introduce tape recordings of the interviews as part of the investigator's testimony, Rose's objection was sus-

tained, and the tapes were not admitted into evidence until Rose testified in the company's case-in-chief, and then only for impeachment.

4. The investigators also testified about the documentary evidence which Rose had provided, including an accounting which showed that Rose had received individually and through Young & Wilcox commissions totalling $258,599.51 from Agrobulk and that the balances in Young & Wilcox's Swiss Bank account at times exceeded $100,000. Rose initially objected to admission of the accounting, but withdrew his objection on the ground that he did not dispute either the accuracy of the accounting or the fact that he had received the funds. Rose also had turned over to the investigators a letter and a telegram dated May 16, 1980, from Rose to the Swiss Bank Corporation requesting it to transfer funds from the Young & Wilcox account to his personal account in Washington, D.C.

5. Rose also told the investigators that he had given Pyne four thousand dollars ($4,000) in cash after receiving the first commission, and wired six thousand dollars ($6,000) from his bank account to Pyne in July 1975, after receiving the second commission. Since Rose's commissions were thereafter received and disbursed by Young & Wilcox, Rose denied knowing if Pyne had received his full share; he admitted, however, that Young & Wilcox had disbursed money to Pyne on a number of occasions.

Upon completion of the first investigator's testimony on direct examination, Rose cross-examined the investigator to establish the basis upon which Rose had made his statements and produced the documents.[6] Rose then moved to strike, as "the by-product of settlement negotiations," all of the investigator's testimony about his statements and the documents he had provided during the investigation; Pyne joined the motion. The trial court denied the motion without prejudice to its being raised at the close of the company's case. Appellants' objection to a second investigator's testimony on the ground of repetition was similarly overruled.

Rose testified as an adverse witness for the company and substantially confirmed the investigators' testimony about what he had told them. He denied any wrongdoing, and related that he had been advised by an experienced shipper who had dealt with the Jamaican Government that the payment of commissions was a regular practice in commodities trading. Rose claimed that the commissions came out of the shipper's profits at no loss to the company, and that he had sought legal advice before accepting them. He also testified that the contracts he negotiated had been profitable for the company, claiming that the company had realized a net profit of $5.5 million in those years, although he acknowledged that he had received the shipping manager's report that the company was being overcharged by the shipping companies. Finally, Rose testified that he had told the investigators that the funds he had given to Pyne were loans, but changed his statement after they indicated their dissatisfaction with his answer and reminded him of the Memorandum.

At the close of the company's case, appellants moved for directed verdicts on the ground that there was insufficient evidence to establish their liability. The motions were denied. Appellants then testified in their defense; both admitted that they had a fiduciary duty to act in the company's best interests, but denied that they had done anything to breach that duty. Rose described the secret commissions as "address commissions," which were paid by a shipper from its profits on a freight contract, and he testified that even if he had not been paid, the shipper would not have reduced his contract price by the amount of the commissions. Pyne testified that the $19,500 he had received from Rose was a partially repaid loan, and that although he knew that Rose had received commissions, he did not believe he had a duty to tell the company since the commissions came from the shipper's profits. He denied any connection with Young & Wilcox or Structural Redevelopment, Incorporated. At the close of all the evidence, appellants moved for a directed verdict, which was denied. In rebuttal, the company called an expert in shipping contracts and brokerage who testified that address commissions are payable to a charterer (here, the company) and constitute a reduction in the rate charged for freight.[7]

The jury returned a verdict for the company, finding Rose liable for $239,000 in compensatory damages and $250,000 in punitive damages, and Pyne liable for $119,000 in compensatory damages and $250,000 in punitive damages. Appellants' motions for a new trial, Super.Ct.Civ.R. 59(a), and Pyne's motion for judgment notwithstanding the verdict, Super.Ct.Civ.R. 50(b), were summarily denied.

6. Prior to completion of the first investigator's testimony on direct examination, Rose objected to the investigator's use of words such as "kickback" or "scheme" on the grounds there was no proof of corrupt dealings. Pyne joined most of the objections. Appellants' hearsay objections were generally overruled, except that throughout the trial, the trial court either sustained Pyne's objections or cautioned the jury to consider the testimony about Rose's statements only as it related to Rose, and not to Pyne.

7. Rose initially objected to this testimony but withdrew his objection when the witness stated that the address commission clause had been deleted from the contracts at issue by the U.S. Department of Agriculture.

## II

▬ The trial court has broad discretion in granting or denying a motion for a new trial. *Queen v. D.C. Transit System, Inc.,* 364 A.2d 145, 148 (D.C.1976) and cases cited therein. This arises from the trial court's unique opportunity " 'to view the proceedings in a perspective peculiarly available to [the trial judge] alone.' " *Id.* (quoting *Cone v. West Virginia Pulp & Paper Co.,* 330 U.S. 212, 216, 67 S.Ct. 752, 755, 91 L.Ed. 849 (1947)). This court will reverse only when there has been an abuse of discretion. *Id.* In reviewing for an abuse of discretion, we must determine " 'whether the decisionmaker failed to consider a relevant factor, whether he relied upon an improper factor, and whether the reasons given reasonably support the conclusion.' " *Johnson v. United States,* 398 A.2d 354, 365 (D.C.1979) (citation omitted). We may examine the record, if necessary, to infer the reasoning on which the trial court made its determination. *Id.* at 366. If we conclude the trial court has erred, then we must determine whether, upon examining the totality of circumstances, the error is of a magnitude to require reversal. *Id.*

▬ Appellants' claims of error focus on the trial court's rulings on the admissibility of evidence. When reviewing such rulings, this court will find an abuse of discretion and reverse only if a party's substantial rights are affected. *National Rifle Association v. Ailes,* 428 A.2d 816, 818 n. 1 (D.C.1981); *Baldi v. Nimzak,* 158

A.2d 915, 917 (D.C.1960); *see Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946); *Farnum v. Colbert,* 293 A.2d 279, 293 (D.C.1972); Super.Ct.Civ.R. 61;[8] *see generally* 11 C. WRIGHT & A. MILLER, FEDERAL PRACTICE & PROCEDURE §§ 2882–83 (1973). Any error in the admission of evidence will generally be deemed harmless if no objection was raised. *Id.* § 2885, at 287; *see Lewis v. Shiffers,* 67 A.2d 269, 272 (D.C.1949); *Miller v. Avirom,* 127 U.S.App.D.C. 367, 369–70, 384 F.2d 319, 321–22 (1967); *Globe Furniture Co. v. Gately,* 51 App.D.C. 367, 368, 279 F. 1005, 1006 (D.C.1922).

Appellants claim the trial court erred, under Super.Ct.Civ.R. 43,[9] in admitting into evidence the Memorandum and the evidence produced by Rose against himself and Pyne in compliance with the Memorandum. The company contends that Rose's agreement in the Memorandum to make full restitution without expressly reserving his rights or denying his liability constituted an admission of liability. In addition, the company contends that appellants waived any objection to the admission of statements made to the investigators because they failed to reserve a privilege to protect their statements. Alternatively, the company contends that Rose repudiated the Memorandum and therefore it and all that was produced pursuant to it were admissible in evidence against him.

▬ It is settled that an offer to compromise, as well as an agreement to settle a claim, is inadmissible on the issue of liabili-

8. Super Ct.Civ.R. 61 provides:
No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or admitted by the Court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the Court inconsistent with substantial justice. The Court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

9. Super.Ct.Civ.R. 43 provides in relevant part:

(a) *Form and Admissibility.* In all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided by these Rules. All evidence shall be admitted which is admissible under applicable statutes, or under the rules of evidence applied in the District of Columbia. In any case, the statute or rule which favors the reception of the evidence governs and the evidence shall be presented according to the most convenient method prescribed in any of the statutes or rules to which reference is herein made. The competency of a witness to testify shall be determined in like manner. . . .

ty. *Farnum v. Colbert, supra*, 293 A.2d at 282; *Harrison v. District of Columbia*, 95 A.2d 332, 334 (D.C.1953) (offer to compromise); *Hiltpold v. Stern*, 82 A.2d 123, 126 (D.C.1951) (same); *Firestone Tire & Rubber Co. v. Hillow*, 65 A.2d 338, 339 (D.C.1949) (same); Fed.R.Evid. 408.[10] *See also Stumpner v. Harrison*, 136 A.2d 870, 872 (D.C.1957) ("offers to pay damages are of little probative force").[11] This general rule is in accord with the judicial preference for the voluntary settlement of civil controversies. *See Farnum v. Colbert, supra*, 293 A.2d at 282; *Autera v. Robinson*, 136 U.S.App.D.C. 216, 218, 419 F.2d 1197, 1199 (1969); *McMahon v. Matthews*, 48 App.D.C. 303, 309 (1919). Thus, a party is "permitted to make an effort to buy his peace without having such effort used against him as an admission of liability." *Harrison v. District of Columbia, supra*, 95 A.2d at 334. The assumption is that were these efforts used against a party, there would be little incentive to offer to compromise or to settle a claim. McCormick on Evidence § 274 (3d ed. 1984).

■■■ The general rule does not control in appellants' case, however, since they did not object to the admission of the Memorandum. *See Lewis v. Shiffers, supra*, 67 A.2d at 272; *Miller v. Avirom, supra*, 127 U.S.App.D.C. at 369–70, 384 F.2d at 321–22; *Globe Furniture Co. v. Gately, supra*, 51 App.D.C. at 368, 279 F. at 1006. Further, in attempting to establish that he had not engaged in fraudulent activities, Rose cross-examined the company's chief investigator about the Memorandum. "One cannot speculate on allowing evidence to be introduced, and participate in developing it, and then, when it proves unfavorable demand that it be stricken." *Lewis v. Shiffers, supra*, 67 A.2d at 272. *See also Levy*

*v. D.C. Transit System, Inc.*, 174 A.2d 731, 734 (D.C.1961). Accordingly, the Memorandum was properly admitted into evidence.

Appellants also contend that the evidence produced pursuant to the Memorandum was inadmissible and that they did not waive their objection to its admission by failing to object to the Memorandum. They contend that the evidence produced as a result of the Memorandum contains an admission of liability by Rose and implicates Pyne even though the Memorandum does not. We first consider whether evidence produced by appellants as a result of the Memorandum is to be accorded the same protection as the Memorandum, and if so, whether appellants have waived their objection to this evidence by failing to object to admission into evidence of the Memorandum. If they have not waived their objection, then we must consider whether appellants' objection to the evidence produced pursuant to the Memorandum was timely.

A.

■■■ The evolution of the law is less clear with respect to statements of fact made or evidence disclosed during settlement negotiations than it is with respect to the settlement agreement itself. The generally accepted doctrine is that an admission of fact during negotiations is inadmissible if it was hypothetical, or was expressly stated to be made "without prejudice," or was "inseparably connected with the offer, so that it cannot be correctly understood without reading the two together." McCormick, *supra* § 274, at 811–12. Determining whether a statement was made by way of compromise or as an admission of fact is not always easy, *Firestone Tire*

---

10. *See infra* note 12.

11. At one time a distinction was made between an offer to compromise or settle and an actual settlement agreement. A "mere offer to compromise" was inadmissible, but the rule did not apply to completed offers to compromise. *Hiltpold v. Stern, supra*, 82 A.2d at 126–27. *See also Harrison v. District of Columbia, supra*, 95 A.2d

at 334 (court not required to determine legal effect had such offer been accepted). That distinction has been abandoned. This court has recognized that a completed settlement agreement is also inadmissible on the issue of liability. *See Farnum v. Colbert, supra*, 293 A.2d at 282. *See also infra* note 12.

& *Rubber Co. v. Hillow, supra,* 65 A.2d at 339, but if a party "hypothetically concede[s] [liability] merely for purpose of settlement," *see Pitts v. United States,* 95 A.2d 588, 589 (D.C.1953), or makes a conditional concession, an offer or agreement is held not to be an admission of fact and is therefore inadmissible.[12] *Firestone Tire & Rubber Co. v. Hillow, supra,* 65 A.2d at 340.

In *Farnum v. Colbert, supra,* 293 A.2d at 283, this court held that it was error to admit into evidence, over objection, "and then consider as significant," facts relating to a completed settlement of a related suit. In restating the long-established policy in the District of Columbia of encouraging settlement agreements, the court cited *McMahon v. Matthews, supra,* 48 App.D.C. at 309, *see* 293 A.2d at 282, which, in turn, relied on *Colburn v. Town of Groton,* 66 N.H. 151, 28 A. 95 (1890). In *Colburn,* the New Hampshire Supreme Court addressed the issue of whether admissions of fact should be excluded along with the offer to compromise. It held that such admission should be excluded if the facts were made

> under the faith of a pending treaty, and into which the party might have been led by a confidence of a compromise taking place. . . . It is the condition, tacit or express, that no advantage shall be taken of the admission, it being made with a view to, and in furtherance of, an amicable adjustment, that operates to ex-

clude it. But if it is an independent admission of a fact, merely because it is a fact, it will be received.

*Id.* at 154, 28 A. at 96 (citing 1 GREENL. EVIDENCE §§ 170, 192).

 We adhere to the view that any admission of fact or evidence produced by a party during settlement negotiations, which establishes liability and is objected to timely, should be excluded. Of course, facts proved by independent evidence would be admissible whether or not admitted by a party during settlement negotiations. Accordingly, the evidence produced by Rose in accordance with the Memorandum, if properly objected to, should have been excluded.

**B.**

 The next inquiry is whether appellants' failure to object to admission of the Memorandum constituted a waiver of any objection to admission of the evidence produced therewith. While the treatises and cases we have found do not contain definitive statements addressing the precise issue presented here, treatment of waiver of other forms of evidence provides a useful analogy. Legal scholars and, in our view, the better reasoned decisions from other jurisdictions conclude that a failure to object to earlier like evidence or evidence "subject to the same objection does not

---

**12.** Rule 408 of the Federal Rules of Evidence eliminated the necessity for a strict analysis of whether a statement was a mere offer to compromise or an assertion of fact. The rule "expands the common law prohibition on the use of evidence of offers of compromise to encompass as well any statements or conduct made during compromise negotiations." 23 C. WRIGHT & K. GRAHAM, FEDERAL PRACTICE & PROCEDURE § 5302, at 174 (1980). The rule provides in relevant part:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or state-

ments made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations.

Although this court has not adopted the Federal Rules of Evidence, it has from time to time looked to those rules for guidance. *See e.g., Butler v. United States,* 481 A.2d 431, 439 (D.C. 1984) (quoting R. 801(d)(2)(E)), *cert. denied,* —— U.S. ——, 105 S.Ct. 1398, 84 L.Ed.2d 786 (1985); *Ohio Valley Constr. Co. v. Dew,* 354 A.2d 518, 523 n. 9 (D.C.1976) (using R. 702 as a guide). Rule 408 "is basically consistent with District of Columbia law." S. GRAAE, DISTRICT OF COLUMBIA STATUTORY AND CASE LAW ANNOTATED TO THE FEDERAL RULES OF EVIDENCE ¶ 4.37 (1976).

constitute a waiver of a later objection."[13] According to Professors Wright and Graham, it is "perfectly preposterous as a matter of policy" to adhere to a rule that a failure to object to earlier like evidence precludes all later objections, for "[i]t [would] require[ ] a party to object to evidence that while inadmissible, does not hurt his case, in order to preserve the right to object to harmful evidence." 21 C. WRIGHT & K. GRAHAM, FEDERAL PRACTICE & PROCEDURE § 5039, at 202 (1977). Professor McCormick comments that "[t]he practice of the best advocates of withholding objection unless it is clear that the evidence would be damaging is in the interest of dispatch of business and would be encouraged by the nonwaiver rule." MCCORMICK, *supra* § 55, at 143.

The rule that a failure to object to earlier like evidence does not preclude a party from later objecting is in accordance with the policy underlying the "privilege analysis" for holding inadmissible offers to compromise and settlement agreements and attendant admissions of fact.[14] This policy seeks to protect "fruits" of an offer to compromise or settlement agreement on the rationale that a party would be unjustly enriched if he could use admissions of fact obtained during a compromise negotiation. 4 WIGMORE, *supra* § 1061, at 40 n. 5 (quoting Tracy, *Evidence—Admissibility of Statements of Fact Made During Negotiation for Compromise*, 34 Mich.L.Rev. 524, 524–30 (1936)). Although this court has not stated whether it adopts the privilege analysis or some other rationale, the facts of this case lend themselves to application of the rationale underlying the privilege analysis. It is readily apparent that appellee would be unjustly enriched if it could use evidence produced pursuant to the

**13.** A few courts have summarily held that a failure to object to earlier like evidence precludes the party from later objecting. *See, e.g., Star Realty v. Strahl,* 261 Iowa 362, 154 N.W.2d 143, 145 (1967) (failure to object to earlier testimony by defendant constituted waiver of right to object to further questions on same subject by same witnesses); *Rash v. Waterhouse,* 124 Vt. 476, 207 A.2d 130, 132 (1965) (same). But a majority appear to follow a less rigid rule. Thus, in *Bobereski v. Insurance Co. of Pennsylvania,* 105 Pa.Super. 585, 161 A. 412 (1932), where an insurance company based its refusal to pay a claim on the ground of incendiarism by the insured, and objected to the admission of records showing a nolle prosequi for lack of evidence in a criminal case against the insured, the insured argued that the company had no right to object because it had not "specially object[ed] to every attempt of the plaintiff to prove the fact of her arrest." *Id.* 161 A. at 415. In rejecting this argument and holding that estoppel or waiver of objection was inapplicable, the court held that a party is not required to object before he deems evidence "both important and harmful." *Id.* A similar holding was reached in *Slocinski v. Radwan,* 83 N.H. 501, 506–07, 144 A. 787, 790–91 (1929), where defendants' failure to object to inadmissible testimony was held not to preclude them from objecting to the admission of other incompetent evidence to corroborate the inadmissible testimony. *See also United States v. Romo,* 669 F.2d 285, 287–88 (5th Cir.1982) (defendant's objection to testimony about associates' convictions was not untimely merely because on cross-examination he answered questions without objection); *Lowery v. Jones,* 219 Ala. 201, 202, 121 So. 704, 706 (1929) ("failure to object to illegal evidence at one time, does not waive a right to object to like evidence offered later." If earlier objections had been sustained, the force of former testimony would probably have been weakened in minds of jury).

**14.** Commentators are not in agreement about the rationale underlying the conclusion that offers of compromise and concomitant admissions of fact are inadmissible. In addition to the privilege analysis, two other theories have been advanced. One theory is that such evidence is irrelevant: an offer to compromise is a desire for peace, and any implied admissions of fact are excluded, but express admissions are not. A second theory is that of implied contract: an offer prefaced by "without prejudice" or a similar term would be excluded. Treatment of admissions under the second theory is unclear, and that theory has been adopted by few American courts. *See generally* 4 WIGMORE, EVIDENCE § 1061 (Chadbourne rev. 1972) and authorities cited; 23 C. WRIGHT & K. GRAHAM, *supra* § 5302 at 172 and authorities cited. Professors Wright and Graham, *id.* § 5302, observe that the privilege theory for excluding offers of compromise is attractive to many commentators.

because it promises better protection for statements of fact made during compromise negotiations. It eliminates the need for the court to search for the intent of the parties or for the parties to cast their statements in any particular form.

Memorandum since considerable evidence was obtained on which the company relied in presenting its case-in-chief.

We hold that appellants' failure to object to admission of the Memorandum did not preclude them from objecting to admission of the evidence produced pursuant to the Memorandum. Upon review of the record we are satisfied that appellants did not at any point admit their liability for fraud or breach of fiduciary duty. The Memorandum does not support the company's contention that it contains an admission of liability by Rose for fraud or breach of fiduciary duty. The company does not dispute that the statements and documents which Rose produced during the investigations were a part of his obligation under the Memorandum. The distinction drawn in some cases between hypothetical facts and facts otherwise obtained is of little relevance in this regard because Rose did not deny receiving the secret commissions, but rather contended his receipt of them did not prove his liability for fraud or breach of fiduciary duty.[15] Therefore, since Rose's admissions to the investigators and his production of documents were made pursuant to the Memorandum by way of compromise, they were made conditionally and are inadmissible. *Harrison v. District of Columbia, supra,* 95 A.2d at 334.

■■■ We find no merit to the company's alternative contention that the "fruits" evidence was admissible because Rose had repudiated the Memorandum by failing to make full restitution of the commissions. The record does not contain evidence that Rose "communicated, by word or conduct, unequivocally and positively [his] intention not to perform." *Order of AHEPA v. Travel Consultants, Inc.,* 367 A.2d 119, 125 (D.C.1976), *cert. dismissed,* 434 U.S. 802, 98 S.Ct. 30, 54 L.Ed.2d 60 (1977); *see Cooper v. Cooper,* 35 A.2d 921, 924 (D.C.

1944) (a dispute as to the manner of performance does not constitute repudiation).

Rose testified in the company's case-in-chief that he was unable to make full restitution because the Swiss bank officials claimed that only Mr. Lanouline was authorized to withdraw funds from the Young & Wilcox account. *See supra* note 3. Evidence established that Rose had attempted to obtain the money from the Swiss account: the company introduced Rose's telegram requesting the transfer of funds, *see supra* note 4, and a company investigator also testified that Rose and his attorney had "made a strong effort" to obtain the Swiss funds. There was also evidence offered by Rose that although he remained ready to cooperate fully, the company had repudiated the Memorandum by failing to set a timetable for full restitution and to continue their discussions when his efforts to retrieve the bank funds proved unsuccessful. The company nonetheless contends that even if Rose's funds from Switzerland were unavailable, his refusal to deposit all of the other funds available to him into a trust account under his attorney's control, as urged by his attorney and the company's representative, evinced a lack of good faith. But Rose testified that the funds in his Chase Manhattan Bank account had been transferred to the State as abandoned property, and no evidence to the contrary was offered; the bank record introduced by the company ended with period August 31-September 28, 1979, six months before the execution of the Memorandum.

## C.

■■■ Finally, we hold that appellants timely objected to admission of the evidence produced pursuant to the Memorandum. By moving to strike and making other appropriate objections to the evidence produced in connection with the Memorandum, and by moving for directed verdicts at the close of the company's case and at

---

15. Rose testified that he did not think that his receipt of the commissions was illegal, but that if returning them was a way to deal honorably with the situation, then he would do so in return for immunity and other benefits.

the close of all the evidence, appellants have preserved for appeal their objection to admission of this evidence. *Cf. Weisman v. Middleton,* 390 A.2d 996, 1000 (D.C. 1978); *Levy v. D.C. Transit System, Inc., supra,* 174 A.2d at 734; *Lewis v. Shiffers, supra,* 67 A.2d at 272. By objecting before answers were given and promptly once the basis for the objection was established, appellants' objections were made at the proper time. *Baldi v. Nimzak, supra,* 158 A.2d at 917; *cf. Lewis v. Shiffers, supra,* 67 A.2d at 272; *Globe Furniture Co. v. Gately, supra,* 51 App.D.C. at 368, 279 F. at 1006.

As noted previously, *see supra* Part I, from the beginning of the trial appellants objected before the answer was given to any testimony which suggested an admission of liability by them. Rose's motion to strike was made as soon as he established by cross-examination of the investigator that his testimony, about Rose's statements and the documents he produced, related to statements and documents which Rose made and produced pursuant to the Memorandum; the motion to strike was made before Rose proceeded with any further cross-examination. Following the denial of his motion to strike, Rose's cross-examination of the investigator focused on the fact that the Memorandum did not contain an explicit admission of liability or refer to "kickbacks," "payoffs" or "fraudulent or corrupt dealings." Pyne joined Rose's objections to the evidence produced under the Memorandum and also continued to object to unredacted testimony which implicated him (Pyne) in such dealings.

In sum, we hold that the evidence produced by Rose in connection with the Memorandum is to be accorded the same protection as the Memorandum, and that appellants did not waive their objection to this evidence by failing to object to admission into evidence of the Memorandum. Since their objection to the evidence was timely, the evidence should have been excluded. The question remains whether there was sufficient evidence independent of that produced pursuant to the Memorandum to support the verdicts. If so, and the inadmissible evidence did not prejudice appellant's substantial rights, then there was no error by the trial court in denying the motion for a new trial.

### III

To prove fraud, a plaintiff must show by clear and convincing evidence that there is a false representation of material fact which is knowingly made with the intent to deceive and action is taken in reliance upon the misrepresentation. *Bennett v. Kiggins,* 377 A.2d 57, 59 (D.C.), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978). Nondisclosure of material information may constitute fraud, *id.,* especially where there is a duty to disclose. *Rothenberg v. Aero Mayflower Transit Co.,* 495 F.Supp. 399, 406 (D.D.C.1980). "Officers and directors of a corporation owe a fiduciary duty to the corporation and to its shareholders, which requires them to act in good faith in managing the affairs of the corporation." *Wisconsin Avenue Associates, Inc. v. 2720 Wisconsin Avenue Cooperative Association,* 441 A.2d 956, 962 (D.C.1982), *cert. denied,* 459 U.S. 827, 103 S.Ct. 62, 74 L.Ed.2d 64 (1982); *Mayflower Hotel Stockholders v. Mayflower Hotel Corp.,* 84 U.S.App.D.C. 275, 277, 173 F.2d 416, 418 (1949). *See United States v. Kearns,* 193 U.S.App.D.C. 344, 347, 595 F.2d 729, 732 (1978) (common law action for breach of fiduciary duty).

By arguing in their motions for a new trial that the verdicts were unsupported by sufficient evidence, appellants in effect contended that the trial court erred by not directing verdicts in their favor. On a motion for a directed verdict at the close of all the evidence, the evidence must be construed most favorably to the plaintiff, according to him the full effect of every legitimate inference from the evidence. *Remeikis v. Boss & Phelps, Inc.,* 419 A.2d 986, 988 (D.C.1980). If when the evidence is so considered, reasonable men might differ, the case should go to the jury; only if

no reasonable man could reach a verdict in favor of the plaintiff, should a motion for directed verdict be granted. *Id.* (citing *Jackson v. Capital Transit Co.*, 69 App. D.C. 147, 148, 99 F.2d 380, 381 (1938), *cert. denied*, 306 U.S. 630, 59 S.Ct. 464, 83 L.Ed. 1032 (1939)).

▉ Evidence uncovered by the company independent of Rose's statements and the documents he produced pursuant to the Memorandum could properly be used to prove appellants' liability for fraud and breach of fiduciary duty. Most of the testimony offered by the company's then current managing director was based on occurrences prior to execution of the Memorandum. This included the fact that the contracts at issue did not provide for commissions to be paid and if they had, then the company, as the charterer of the vessels, would have been entitled to receive commissions. The domestic bank records of Rose and Young & Wilcox, which the Justice Department turned over to the Jamaican Government, showed deposits of Agrobulk checks, three checks (for $4,000, $6,000, $3,000) which Rose made payable to and were endorsed by Pyne and a cash transfer (of $6,000) from Rose to Pyne in July 1975 after Rose had deposited a check from Agrobulk. Pyne's bank account records showed a corresponding receipt of the cash transfer.

Viewing the independent evidence most favorably to the company, Rose and Pyne, directors of the company, either received or knew that the other had received commissions from the shippers with whom the company had contracted. Rose was the chief executive officer for the company and fully conversant with its purpose to lower consumer prices by direct purchasing in bulk. Yet, in violation of his employment contract, he accepted the commissions from the shipping companies with whom he negotiated contracts on behalf of the company. He never told the company about the commissions although he knew, as a result of the shipping manager's report, that the contracts he had negotiated were not considered financially advantageous to the company and, hence, he knew that the secret commissions were costing the company money. We hold that the independent evidence was sufficient to show by clear and convincing evidence that Rose's failure to disclose the secret commissions to the company constituted fraud and a breach of his fiduciary duty to the company.

We also hold that the independent evidence was sufficient to prove Pyne's liability. Pyne testified that he knew Rose had received commissions from the shippers but never told the company. The independent evidence established that Pyne was the company's chief overseas representative and its "chief strategist" in developing price reduction policies for purchasing commodities; one goal of the company, which was set forth in a description of Pyne's duties, was to find new markets and make direct purchases in order to lower prices for the consumer. He had direct responsibility for reducing the costs of goods being shipped to Jamaica and monitoring "liaison functions" with the shipping agents, among others. Pyne admitted that he was familiar with the shipping contracts, and also was aware of the adverse evaluation of the shipping company's prices by the shipping manager. He also admitted that he relied on the same shipping agent, Smith, *see supra* note 3, whom he knew was paying Rose's commissions, to arrange for shipping the commodities that he (Pyne) purchased for the company. In addition, as a member of the Board of Directors, Pyne was chargeable with knowledge that no employee of the company could receive commissions without violating Jamaican law. From all the facts and circumstances proved by independent evidence, we conclude that the company met its burden to establish by clear and convincing evidence Pyne's knowledge that the secret commissions were harmful to the company's best interests.[16] Therefore, Pyne's failure to

---

16. We find no merit to Pyne's contention on appeal that the trial court erred in not *sua*

disclose to the company that Rose was receiving secret commissions from the shippers with whom the company had contracted constituted fraud and was a breach of his fiduciary duty to the company.

■ We further conclude that the inadmissible evidence did not prejudice appellants' substantial rights as to their liability, as distinct from the amount of damages assessed against them. The inadmissible evidence focused primarily on the amount of secret commissions which Rose had received and shared with Pyne. Rose's admission in January, 1979 that he had received the commissions left open only the question whether the receipt of such commissions was illegal. This was clearly established by the terms of his employment contract with the company and his fiduciary duty as an officer of the company. Similarly, Pyne's liability to the company was established by his January, 1979 admission, after he became a director of the company, that he knew Rose was receiving secret commissions and did not disclose that fact to the company.

## IV

■ The company was entitled to recover as compensatory damages the total amount of the secret commissions paid with respect to the contracts at issue. *See Chapman Realty Co. v. Crump*, 80 A.2d 615, 616 (D.C.1951) (measure of damages in case of deceit includes direct consequences of false representation), *Horning v. Ferguson*, 52 A.2d 116, 119 (D.C.1947) (same); FLETCHER ON CORPORATIONS § 1343, at 617 (1975). Its admissible evidence, namely Rose's admission before he was terminated and appellants' bank accounts, was sufficient to prove that appellants had received

secret commissions. FLETCHER, *supra* § 1343, at 617 (proof by preponderance of the evidence). But the verdicts demonstrate that the amount of compensatory damages assessed against appellants was affected by inadmissible evidence. Because the accounting in affidavit form was hearsay, Rose's general admission to the company prior to preparation of the affidavit was insufficient to establish by competent evidence the actual amount of the commissions that he had received. As to Pyne, the trial court's instruction to the jury not to consider Rose's admissions against Pyne did not cure the error, *Penwell v. District of Columbia*, 31 A.2d 891, 893 (D.C.1943) (where record revealed that inadmissible hearsay made strong impression upon jury, error not cured by instruction); Rose testified that he agreed to give Pyne half of the commissions and the verdict against Pyne was half of the verdict against Rose.[17]

■ Therefore, because the inadmissible evidence had a "substantial impact" on the assessment of damages,[18] *Johnson, supra*, 398 A.2d at 366, appellants are entitled to a new trial on compensatory damages. In addition, because a verdict assessing punitive damages can be returned only when there is also a verdict assessing compensatory or actual damages, *Bay General Industries, Inc. v. Johnson*, 418 A.2d 1050, 1058 n. 21 (D.C.1980); *Franklin Investment Co. v. Smith*, 383 A.2d 355, 358 (D.C.1978), we reverse the verdicts assessing punitive damages.

Accordingly, we affirm the judgments of appellants' liability but reverse and remand for a new trial on damages.

*Affirmed in part, reversed in part, and remanded.*

---

*sponte* ordering a severance. *See supra* note 6.

**17.** We find no merit to appellant's contention that the company's prayer for compensatory damages defined the maximum limit of the jury's power to award compensatory damages. *Green Miller v. District of Columbia*, 479 A.2d 329, 331 (D.C.1984). *Compare Williams v. Steuart Motor Co.*, 161 U.S.App.D.C. 155, 166, 494

F.2d 1074, 1085 (1974); *Denison v. Lewis*, 5 App.D.C. 328, 333 (1895).

**18.** We need not decide whether the jury impermissibly apportioned its verdicts among joint tortfeasors. *Remeikis v. Boss & Phelps*, 419 A.2d 986, 991–92 n. * (D.C.1980) (dictum), citing *McKenna v. Austin*, 77 U.S.App.D.C. 228, 134 F.2d 659 (1943) (joint tortfeasor releases).