George **GOON**, et al., Appellants,

v.

**GEE KUNG TONG, INC.,** Appellee.

No. 85–1440.

District of Columbia Court of Appeals.

Argued May 14, 1987.
Decided June 16, 1988.

---

Charles C. Parsons, with whom Harold B. Peek, Washington, D.C., was on the brief, for appellants.

Claire O. Ducker, Sr., Locust Grove, Va., for appellee.

Before BELSON, ROGERS and STEADMAN, Associate Judges.*

PER CURIAM:

Appellants participated in several private Chinese lending and borrowing organizations known as "wuis" which operated at the premises of appellee, Gee Kung Tong, Inc. When the wuis failed, appellants brought suit against appellee alleging that it had guaranteed their deposits. The trial court directed a verdict for appellee, based in part on the Statute of Frauds. A letter written by appellee's attorney which purportedly admits liability was proffered to meet the Statute's requirement of a writing of guaranty. We hold that the trial court erred in its ruling that this letter was an offer of compromise and hence inadmissible. The trial court's alternative ground for a directed verdict based on insufficiency of proof of loss by production of secondary evidence is also brought into question. Accordingly, we remand the case for further proceedings.

I.

Appellee, Gee Kung Tong, Inc., is a Chinese fraternal organization[1] that owned a building used by various civic groups and members of the local Chinese community. For many years, local wuis operated out of appellee's premises. The basic operation of a wui does not appear to be in dispute.[2] The members meet each week to pool a small sum of money to lend to one member for a small interest charge. The interest charge is bid up by the wui members who wish to borrow the pool that week and the interest is immediately deducted from the loan. Each borrower personally signs for the loan and in addition must furnish a guarantor's signature. Members can only borrow once but must continue to make their contribution each week; therefore as the pool progresses, the pool members change from creditors to debtors. The wui ends when every member has borrowed. The wui is run by a chairman who keeps the records; a one-time surcharge is paid in the first week to take care of expenses and compensate the chairman.

During 1976, four wuis were operating at appellee's building; these wuis were known by the names of their chairmen, Sam Wong, Ken Loy Lee, Leo Lee and Frank Lau. The members, which included appellants David Lee Wah, George Goon, Ng Peng and Chu Moy, were issued pass-

---

* Associate Judge Belson was selected as a member of the division to replace Senior Judge Nebeker, who withdrew from active judicial service on December 11, 1987.

1. Appellee's name translated into English is the Chinese Free Masons.

2. This private banking system apparently evolved at a time when Chinese immigrants had difficulty obtaining loans from American institutions.

books,[3] and each wui chairman, except Lau, was a corporate officer of appellee. In early November 1976, appellee's officers became aware that Sam Wong, a wui chairman who also served as co-president of appellee, had embezzled a large sum of money from the wuis.[4] Appellee's other co-president, Henry Wing Hoy, then directed that the wuis cease operating at appellee's premises and someone posted a notice to that effect on November 16, 1976. These wuis never resumed operation and it appears that no money was ever recovered from Sam Wong or from the members who had outstanding loans. Nor were any funds recovered from the individual guarantors who co-signed the loans.

Appellants, alleging that they had lost money in the wuis, obtained counsel who wrote to appellee demanding an accounting and threatening suit. A series of letters ensued in which the responses from appellee were written by an attorney, Claire Ducker, Sr.,[5] including the crucial five page letter of April 1, 1977. That letter discussed numerous topics including: speculation as to how Wong stole the funds; the

results of accounting said to have been performed by Ken Loy Lee, a wui chairman and appellee's treasurer;[6] a list of the assets of appellee; two proposed plans of appellee's officers for liquidating appellee's assets to pay any claims; and a discussion of the operation of the wuis which included the statement: "The Chinese Free Mason Association guarantees the solvency of any bank conducted under its auspices."

The plans mentioned in the letter to reimburse the wui members out of appellee's assets did not materialize and appellants filed suit in May 1977 against appellee and the four wui chairmen. The suit alleged that appellee operated the banks or alternatively that it had guaranteed the members' deposits. The individual defendants were never served and the case proceeded to trial against appellee alone. After numerous delays and two mistrials, the case was tried in October 1985, ending in a directed verdict for appellee.

## II.

In directing a verdict, the trial court relied in a major part on the Statute of

3. Some testimony indicated that these passbooks included the name of a related entity or perhaps appellee itself. For the purpose of this appeal, we need not determine whether these passbooks themselves satisfied the requirements of the Statute of Frauds, quite apart from the excluded letter.

4. Ideally, the pool should be distributed each week with all members in attendance, thus allowing no opportunity for theft. These wuis were more informal and complex. While each member could own only two shares in a wui, many individuals held shares for friends and relatives in all four wuis at the same time. Furthermore, all members did not attend each meeting and the chairmen often performed ministerial tasks for the other wuis. Thus, apparently, Sam Wong, who was having business problems, was for a period of time able to operate various undetected schemes to siphon money. For example, he allegedly borrowed money each week in the names of routinely absent members while using a portion of the stolen funds to avoid defaults on the weekly payments of these members. The briefs, transcript, and exhibits do not give a completely consistent picture as to how the operation of these wuis so diverged from the ideal described that Wong was able to steal allegedly over $100,-000. This factual question, however, is not material to resolution of the issues in this appeal.

5. At trial appellee contended that when these letters were written, Ducker represented only an individual officer of appellee and not the corporate appellee; hence, he had no authority to bind appellee as its agent. Ducker was appellee's trial and appellate attorney. He also was called as a witness by the plaintiffs. At trial, when confronted with the letter on his stationery with his signature, he did not deny writing the letter but disavowed any recollection of it. The trial court ruled that there was conflicting evidence on the question of authority which would present a question of fact for the jury, if the letter were to be admitted. With respect to Ducker's dual role as attorney for the defendant and a witness for plaintiffs, the plaintiffs moved to have Ducker disqualified as counsel for the defendant on the basis of DR 5-102 of the D.C. Code of Professional Responsibility ("Withdrawal as Counsel When the Lawyer Becomes a Witness"). The trial court denied the motion, noting the uncertainties as to how the trial might actually develop. This issue remains open in further proceedings in the case for consideration by the trial court.

6. While the letter can be read to establish the total monetary liability of the wuis to the members (which is within $200 of the amount allegedly stolen by Wong), there is no admission or calculation of the amounts the wuis owed to these particular appellants.

Frauds; that is, the appellants' failure to produce any writing obligating appellee. Appellants testified that they had deposited money in the wuis because they believed that the Gee Kung Tong guaranteed the solvency of the wuis. Under the Statute of Frauds, codified at D.C.Code § 28-3502 (1981), a contract to "answer for the debt, default, or miscarriage of another" must be in writing to be enforceable. Therefore, appellants' oral testimony alone was insufficient to establish their case on a theory of guaranty. *Tauber v. Jacobson,* 293 A.2d 861, 866 (D.C.1972). Appellants contended that the sentence quoted from the April 1 letter was an admission of liability sufficient to take the alleged promise to guarantee the wuis out of the Statute of Frauds under such cases as *Wemhoff v. Investors Management Corp.,* 455 A.2d 897, 899 (D.C.1983) (admission that contract existed in answer to complaint), and *Hackney v. Morelite Construction,* 418 A.2d 1062, 1067 (D.C.1980) (stipulated facts sufficient to establish agreement).[7] The trial court, however, excluded the letter in toto, ruling that it was an offer of compromise and contained statements made in compromise negotiations.

It is well settled that an offer to compromise a claim is inadmissible on the issue of liability. *Wayne Insulation Co. v. Hex Corp.,* 534 A.2d 1279 (D.C.1987); *Pyne v. Jamaica Nutrition Holdings Ltd.,* 497 A.2d 118, 126–27 (D.C.1985), and cases cited; McCORMICK, EVIDENCE § 274 (3d ed.

1984). Furthermore, under the recent expanded view, as expressed in FED.R.EVID. 408,[8] statements made by a party during compromise negotiations should also be excluded to encourage unfettered dialogue in such negotiations, as to further the underlying policy favoring out-of-court settlement of disputes. *Pyne, supra,* 497 A.2d at 128; FED.R.EVID. 408 advisory committee notes; 2 J. WEINSTEIN & M. BERGER, WEINSTEIN'S EVIDENCE ¶ 408[03] (1986).[9]

What constitutes an offer of compromise has generated some disagreement among the commentators. Weinstein asserts that it is "relatively simple in most cases to identify communications as overtures for settlement." 2 J. WEINSTEIN & M. BERGER, *supra,* ¶ 408[03], at 408-24. On the other hand, Wright & Graham set forth at length the potential difficulties in determining the issue. 23 C. WRIGHT & K. GRAHAM, FEDERAL PRACTICE AND PROCEDURES §§ 5306, 5307 (1980). Our case law seems to confirm the WRIGHT & GRAHAM view. *Firestone Tire & Rubber Co. v. Hillow,* 65 A.2d 338, 339 (D.C.1949) (not always easy to determine whether a statement is made by way of compromise).

However, for many years this court has held that an unconditional and unqualified acknowledgment of liability and promise to pay is admissible. In *Firestone Tire & Rubber Co., supra,* after being served with the complaint, the manager of the defendant corporation called plaintiff's attorney,

---

**7.** Appellee claims to distinguish these cases on the basis that they all involve in-court admissions or court documents. However, there has never been a requirement that the writing used to take a contract out of the Statute of Frauds be court-related. *See Coffin v. District of Columbia,* 320 A.2d 301, 304–05 (D.C.1974) (plaintiff's summary of work he performed initialed by defendant sufficient to satisfy Statute of Frauds).

**8.** The rule states in pertinent part:

Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or state-

ments made in compromise negotiations is likewise not admissible.

**9.** The briefs debate the question of whether the concession of liability could be admissible even if other sections of the letter are construed as an offer or compromise. Under older case law, distinct admissions of fact that were not stated hypothetically were not summarily excluded simply because they were made in connection with an effort to compromise. *United Securities Corp. v. Franklin,* 180 A.2d 505, 509 (D.C.1962). While this jurisdiction has not adopted the Federal Rules of Evidence, this court will look to those rules for guidance. *Pyne, supra,* 497 A.2d at 128 n. 12, states that Rule 408 "is basically consistent with District of Columbia law" and approves its reasoning abolishing the exception for distinct admissions of facts as unworkable and inconsistent with the policy of encouraging settlements.

admitted liability and upon learning that the property had a small salvage value, agreed to secure a company draft for the net amount then claimed plus court costs. We affirmed a trial court ruling of admissibility, holding that the statement could not be construed as an offer of compromise because it was an "unconditional and unqualified acknowledgment of liability and promise to pay." *Id.* at 340. As McCormick notes:

> An offer to pay an admitted claim is not privileged. There is no policy of encouraging compromises of undisputed claims. They should be paid in full. If the validity of the claim and the amount due are undisputed, an offer to pay a lesser sum in settlement or to pay in installments would accordingly be admissible.

McCormick, Evidence, *supra*, § 274 at 811 (citations omitted).[10] Thus, we have held that a simple promise to pay is not an offer to compromise, *Lee v. District of Columbia*, 117 A.2d 922, 923 (D.C.1955), and that a letter confirming a request for reimbursement of medical expenses which was written at a time when the parties were not engaged in a dispute is neither an offer to compromise nor a compromise agreement. *Crain v. Allison*, 443 A.2d 558, 565–66 (D.C.1982).[11]

The substance of the inquiry is to determine, in light of the circumstances, whether the document at issue and the statements therein are made in the context of an "apparent dispute" or "apparent difference of view" as to either the validity of the claim or the amount due. 23 C. Wright & K. Graham, *supra*, § 5306, at 213.[12] Furthermore:

> In determining whether the statement or conduct in question was a part of compromise negotiations, the trial judge should bear in mind that the purpose of the expanded exclusionary rule is to insure freedom of communication with respect to compromise negotiations.

J. Weinstein & M. Berger, *supra*, ¶ 408[07], at 408–12. On the other hand, as our *Firestone* case indicates, it is not appropriate to unduly strain the concept so as to permit a party to take a position at a trial in plain opposition to unqualified statements made in writing in contexts unrelated to settlement discussions.

With this framework of analysis in mind, we turn to the case before us. We recognize that we deal here with a question of admissibility of evidence, where traditionally the discretion of the trial court has been broad. *Johnson v. United States*, 452 A.2d 959, 960–61 (D.C.1982).[13] Nevertheless, we conclude that the critical statement in the letter simply cannot be viewed as having been made in a situation causing it to fall within the exclusionary ambit of the rule of compromise negotiations.

The letter came about as a result of a demand for an accounting made by appellants' attorney upon appellee through Ducker. Although appellants' attorney[14] referred to the possibility of a suit if an accounting was not received, there was no outstanding dispute between the parties at

---

**10.** The advisory committee's notes to Rule 408 made a similar point:

> The policy considerations which underlie the rule do not come into play when the effort is to induce a creditor to settle an admittedly due amount for a lesser sum. Hence the rule requires that the claim be disputed as to either validity or amount.

Fed.R.Evid. 408 advisory committee notes (citation omitted).

**11.** *Evans Products Co. v. Clinton Building Supply, Inc.*, 174 Conn. 512, 391 A.2d 157 (1978), heavily relied on by appellants, is a like holding from another jurisdiction. There, the court characterized the statement in question as one "clearly ... intended as an outright acknowledgment of an overdue debt of $17,594.55." *Id.* at 518, 391 A.2d at 160–61.

**12.** A contextual interpretation of events will avoid the pre-Rule 408 requirement of precatory language to ensure that any independent statement of fact was reserved as "hypothetical."

**13.** To a considerable degree the issue of whether a particular writing is a product of compromise negotiations can be viewed as one of fact. *See* 2 J. Weinstein & M. Berger, *supra*, ¶ 408[03] at 408–24; 2 D. Louisell & C. Mueller, Federal Evidence, § 171, at 462; Schmertz, *Relevancy and Its Policy Counterweights: A Brief Excursion Through Article IV of the Proposed Federal Rules of Evidence*, 33 Fed.B.J. 1, 17 (1974) ("a tricky question of fact").

**14.** Appellants have new counsel on appeal.

the time and none would arise unless appellee denied liability and the amount.[15] The April 1, 1977 letter plainly was the detailed accounting that was sought. Its opening sentence began: "I was finally supplied sufficient figures to give an accounting late this afternoon." It then proceeded to do so in great detail, with specific dollar figures. In the course of the accounting, it stated unequivocally that "[t]he Chinese Free Mason Association [appellee] guarantees the solvency of any bank conducted under its auspices." The letter described how the association planned "to marshal all its assets, sell the property which it owns and distribute the proceeds among the members on a pro-rata basis," estimating that the return would be approximately "forty cents on the dollar." In the event the plan was not approved by the association, a voluntary bankruptcy petition would be filed to accomplish the same result. Looking to the future, the letter proposed that any dispute "between the [association's] *trustee* and any individual member" [emphasis added] would be settled by an arbitration committee elected by the association. Put another way, in response to a demand for an accounting, the letter in effect said "we acknowledge the debt and will liquidate everything we have in order to pay it, but we are not yet sure how much our assets will bring or how best to effectuate payment of the money we do raise." There simply is no dispute as to liability or amount.[16] Although the letter is lengthy because it described the nature of the banking arrangements, the embezzlement and proposed the sale of the corporation's only asset to pay the debt, the letter is directly analogous to the letter in *Crain, supra.*

Nor does the letter contain any qualifications with respect to the critical matters at issue. While the trial court remarked that the letter was "rite with equivocations," this reference was coupled with an explicit acknowledgment that they were relevant to the issue of weight and not to the issue of admissibility.[17]

Under these circumstances, where the trial judge's exercise of discretion focused on criteria relevant to another issue, deference to the trial judge's determination becomes problematic. *See Johnson v. United States,* 398 A.2d 354, 365 (D.C.1979) (appellate court must decide, *inter alia,* whether trial judge's reasons support the exercise of discretion).

In sum, we are constrained to hold that the trial judge erred in excluding the April 1st letter for all purposes. We must reverse and remand the case so that a jury can decide whether Mr. Ducker had actual or apparent authority to bind the corporation as he purported to do in the April 1st letter. *See note 6, supra.*

### III.

Although a major focus on appeal is the Statute of Frauds problem, the trial court, with respect to three of the plaintiffs, alternatively based its grant of a directed verdict on their failure to sufficiently prove their individual losses. Essentially at issue is the absence at trial of the "Big Book" of accounts kept by the wuis directly or by appellee, which was referred to by various witnesses.[18] The parties dispute who bore responsibility for the nonavailability of the

---

15. A subsequent letter of June 7, 1977 confirmed the absence of a dispute, stating "the plan advanced by the national officers is ... to see to it that the creditors are paid off in full...."

16. Federal Rule of Evidence 408 applies only to claims which are "disputed as to either validity or amount," and provides no guidance for determining whether a statement is made in order to offer a compromise.

17. For example, the writer states that he "cannot vouch for the figures," and there is refer-

ence to the amount that Mr. Wong "is alleged to have borrowed." The ultimate amount that could in fact be paid was dependent upon uncertain recoveries from Mr. Wong and the debtor wui members, with the possibility of a trustee and arbitration committee to settle any disputes about how much a specific member was owed.

18. It is not always clear in the record whether the "Big Book" was a single book or several books of account collectively referred to as the "Big Book."

"Big Book." [19] The possibility would be open for secondary proof of the respective individual loss of each plaintiff if plaintiffs could show that this primary source material was unavailable through no fault of their own. See *Roberts v. United States*, 508 A.2d 110, 112 (D.C.1986) (citing *Edmunds v. Frank R. Jelleff, Inc.*, 127 A.2d 152, 155 (D.C.1956)) (contents of documents innocently destroyed can be proven by secondary evidence if there is no reasonable suspicion of fraud); *Schnucks Twenty–Five, Inc. v. Bettendorf*, 595 S.W.2d 279, 283 (Mo.Ct.App.1979) (quoting 29 AM.JUR.2d, *Evidence*, § 459 (1967)) (courts may permit introduction of secondary evidence if primary evidence is "lost or destroyed, is outside the jurisdiction, is in the possession or control of an adversary, or is otherwise unavailable or inaccessible to him, or is voluminous or complicated"). *Cf., R.S. Willard Co. v. Columbia Van Lines Moving & Storage Co.*, 253 A.2d 454, 456–57 (D.C.1969) (best evidence rule not always "an inflexible and unyielding one"; damages permitted to be approximated on facts of case) (citation omitted). The record here seems to reflect no clear and precise ruling on this issue.[20] In any event, any such ruling might have been affected by the exclusion from evidence of the April 1, 1977 letter which refers to "books of account" resorted to by appellee's treasurer, sets forth precise dollar figures as to gross amounts owed, and, of course, also contains the statement clarifying appellee's relation to the wuis themselves. Therefore, the matter remains open for further consideration in a new trial.

*Reversed and remanded.*

---

**19.** Appellants' attempts to obtain the "Big Book" pretrial were unavailing. One deposition witness, a corporation president from appellee's national headquarters in New York, testified that that office did not have the "Big Book," notwithstanding testimony that it had been returned there by one of the plaintiffs after it had been made available through appellee to appellants' trial counsel who had looked at it in the District of Columbia.

**20.** We do not read as necessarily dispositive either the generalized ruling with respect to an insufficient foundation having been laid to permit questioning of one witness about her reading of the Big Book or the directed verdict against Lee Wah, who took the Big Book to New York and failed to try to retrieve it.