Albert A. and Mary Grace **REMEIKIS**, Appellants,

v.

**BOSS & PHELPS, INC.** and Western Exterminating Company, Inc., Appellees.

No. 79–361.

District of Columbia Court of Appeals.

Argued March 27, 1980.

Decided Aug. 28, 1980.

Daniel E. Schultz, Washington, D. C., with whom Melinda Gray Murray, Washington, D. C., was on the briefs, for appellants.

Joseph F. Cunningham, Washington, D. C., for appellee, Boss & Phelps, Inc.

Michael Evan Jaffe, Washington, D. C., with whom George R. Kucik, Howard V.

Sinclair and Kathleen A. Morse, Washington, D. C., were on the brief. Anita Barondes, Washington, D. C., also entered an appearance, for appellee, Western Exterminating Co., Inc.

Before GALLAGHER, MACK and PRYOR, Associate Judges.

GALLAGHER, Associate Judge:

Appellants bought a house which, they discovered after closing, had extensive termite damage. They sued (a) the seller, Mrs. Herman, for breach of contract and fraud, and (b) the real estate agent, Boss & Phelps, and termite inspection company, Western, for negligence and fraud. Mrs. Herman settled the breach–of–contract and fraud claims against her by tendering $10,-000. Later, during trial, she died and the cross claims against her were dropped. At the close of the plaintiffs' evidence, the trial judge granted a directed verdict in favor of Boss & Phelps and Western on the remaining two counts. We reverse, concluding that sufficient evidence was introduced to allow a jury to find negligence or fraud.

■ On a motion for directed verdict, it is well settled that the evidence must be construed most favorably to the plaintiff; to this end he is entitled to the full effect of every legitimate inference therefrom. If upon the evidence, so considered, reasonable men might differ, the case should go to the jury; if, on the other hand, no reasonable man could reach a verdict in favor of the plaintiff, the motion should be granted. [*Jackson v. Capital Transit Co.*, 69 App.D.C. 147, 148, 99 F.2d 380, 381 (1938), *cert. denied*, 306 U.S. 630, 59 S.Ct. 464, 83 L.Ed. 1032 (1939).]

*See Kendall v. Gore Properties, Inc.*, 98 U.S.App.D.C. 378, 384, 236 F.2d 673, 679 (1956); *Tobin v. Pennsylvania R. Co.*, 69 App.D.C. 262, 100 F.2d 435 (1938), *cert. denied*, 306 U.S. 640, 59 S.Ct. 488, 83 L.Ed. 1040 (1939). We conclude that appellants introduced ample evidence to satisfy this standard.

■ The elements of fraud are (1) a false representation (2) of material fact (3) knowingly made (4) with intent to deceive and (5) action taken in reliance upon the misrepresentation. *Jacobs v. District Unemployment Compensation Board*, D.C. App., 382 A.2d 282 (1978); *Bennett v. Kiggins*, D.C.App., 377 A.2d 57 (1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978); *United States v. Kiefer*, 97 U.S.App.D.C. 101, 228 F.2d 448 (1955), *cert. denied*, 350 U.S. 933, 76 S.Ct. 305, 100 L.Ed. 815 (1956). When viewed in the light most favorable to them, appellants' evidence could be taken to reveal a deliberate scheme by Boss & Phelps and Western to mislead appellants as to the extent of termite damage in the house, which scheme would amount to fraud.

It is undisputed that Mrs. Herman employed Western the year before she sold her house to inspect and treat the premises for termites. Western's 1974 report showed "termite damage to window sill . . . joists and support beams . . . subflooring and finished flooring." (Plaintiff's exhibit 9.) When appellants were shown the house by Rita Connors, a Boss & Phelps real estate agent, Mrs. Remeikis noted what she suspected were termite tracks. Mrs. Connors told her not to worry, because the Boss & Phelps contract provided the best available protection to the buyer, not only against presence of termites, but also against termite damage. Indeed, the sales contract signed by the Remeikises and Mrs. Herman on April 2, 1975 contained the following clause:

Seller agrees to furnish purchaser with a letter from a reliable termite company that the premises are free from termite damages and/or infestation at time of settlement.

On June 5, 1975, Boss & Phelps asked Western to furnish the termite clearance report. Western's sales representative, Mr. Barrett, who had inspected and treated the house in 1974, performed an inspection on June 25, 1975. Western's termite clearance report, dated July 9, 1975, was handed to the Remeikises at closing on July 10, 1975.

The form report stated that the house had been treated in 1974, and that the guarantee against reinfestation remained in force. At issue here, two further statements on the preprinted form were checked off, indicating there was "no visible evidence of present termite activity," and "no visible evidence of structural termite damage." Next to the word "damage" was a footnote, filled in at the bottom of the form as follows: "old evidence of termites in basement–inactive."

When the real estate agent handed appellants the report at closing, she also told them that there had been a small problem in the basement, which had been taken care of, and got Mrs. Herman to show Mr. Remeikis the receipt for repair of one beam. Mr. Remeikis then stated, "if this takes care of everything, fine." The real estate agent made no response, and the sale was concluded.

Four evidentiary items support appellants' contention that Western and Boss & Phelps suppressed an earlier written report which revealed the full extent of the termite damage and substituted the more favorably worded July 9 report given to the buyers at closing. A controversial piece of evidence is the entry in Boss & Phelps' file on July 2, of the notation "Term. in., damage, copy to Rita." Appellants maintain that the notation refers to a written report sent from Western to Boss & Phelps revealing extensive termite damage, which report was suppressed. Boss & Phelps maintain that the notation refers to a telephone call to Western, where the only damage mentioned was one unsound beam. They claim they received no written report until July 9, the day before settlement. Appellants introduced a number of identical notations "term. in." in files of other properties where Western performed the termite inspection, and each time the notation referred to Western's written report dated a few days prior to the notation. The second piece of evidence is Boss & Phelps' letter of July 7 to the title company which said "enclosed . . . is a copy of the termite report from Western Exterminating Company, Inc. which indicates the presence of old damage." Third, and perhaps most damaging, is the testimony of Mr. Hannum, a repairman hired by Mrs. Herman on July 7 to replace one termite–damaged beam. Mr. Hannum stated that he saw a termite report on a preprinted form which listed extensive repairs needed, and that this report was not the July 9 report nor the 1974 report prepared by Western when they first treated the house. The final testimony supporting appellants' theory is Mr. Remeikis' own statement that Mr. Barrett, the Western employee who inspected the house and wrote the report, admitted after closing that there had been an earlier report indicating extensive damage.

Some evidence was also presented which weakens appellants' theory of an earlier report. The secretary at Boss & Phelps stated that her July 2 notation "Term. in., damage, copy to Rita" could have referred to a telephone message, not a written report. Mr. Connors at Boss & Phelps said the basis for the notation was his call to Western on July 2 when Mr. Barrett told him that one beam was damaged (the one later mended by Mr. Hannum). Mr. Barrett's testimony agreed insofar as he said there was only a telephone conversation on July 2; however, he testified that in the telephone conversation, he told Mr. Connors he expected there was damage to flooring and subflooring, not just to one beam.

This contradictory testimony creates an issue of fact for the jury. Certainly, there was more that the "barely perceptible evidence of fraud" noted by the trial court. A jury could reasonably conclude that Western and Boss & Phelps knowingly made a false representation of material fact with the intent to deceive.

■ Even if Western's July 9 report was not literally false, in that it said there was no *visible* evidence of termite damage, a statement literally true is actionable if made to create a false impression. *Tucker v. Beazley,* D.C.Mun.App., 57 A.2d 191, 193 (1948) (seller of rooming house correctly told buyer the present rentals, but neglected to state that these rentals were higher

than those allowed by law). *See* Restatement (Second) of Torts § 529 (1977) (misleading half truths can be fraudulent misrepresentations). Furthermore, even silence about the material fact of termite damage can amount to a false representation in circumstances where Boss & Phelps and Western would be expected to speak, as here, having undertaken an examination of the premises for appellants' protection. *See Borzillo v. Thompson*, D.C.Mun.App., 57 A.2d 195 (1948) (when seller volunteers information, but is silent as to relevant unfavorable material, his statement constitutes a fraudulent representation). *See also Ehrlich v. Real Estate Commission*, D.C.Mun. App., 118 A.2d 801 (1955) (brokers fraudulently failed to reveal zoning restrictions).

One reason the trial court gave for its directed verdict was that the evidence did not establish the reliance element of fraud. The trial court opined that any reliance by the Remeikises on the termite clearance report was unjustified, because they had been sufficiently put on notice as to the presence of termite damage by their own observation, by the fact that one beam had to be mended before settlement, and by Mr. Remeikis' alleged examination of Western's 1974 report and diagram of the extensive damage to the house. As to the latter, although Mrs. Herman testified that she showed Mr. Remeikis her folder containing Western's termite guarantee and 1974 report, Mr. Remeikis denied having read it. The jury should have been allowed to resolve this fact question by comparing the credibility of the two witnesses. As to appellants' own observations of termites and the fact that one beam had to be mended, when each of these matters came to the Remeikises' attention, it was countered by the real estate agent's assurances, first, the overt assurance that the contract would offer complete protection and later, the implied assurance by silence when Mr. Remeikis said "if [the beam repair] takes care of everything, fine." Thus, there was not sufficient evidence to determine, as a matter of law, that the Remeikises' reliance was unjustified.

The evidence, if believed, supports an inference that Western and Boss & Phelps knew of extensive termite damage, and deliberately hid this knowledge from the Remeikises. Even if the jury were to conclude that one or the other defendant did not have *actual* knowledge of the damage, they could find fraud if they concluded that defendants made a false representation *recklessly* without knowing whether or not the house was damaged. A similar situation arose in *Spargnapani v. Wright*, D.C.Mun. App., 110 A.2d 82 (1954) where a broker innocently told the buyers a house could be heated for $100 a year when, in fact, the boiler was cracked and the defect had been concealed by the owner. This reckless representation was held to be fraudulent. If the false representation were not made recklessly, however, but merely negligently, appellants could not recover for fraud, though possibly for negligence.

█ Appellants introduced sufficient evidence of negligence to withstand a motion for directed verdict on that count. The elements to be proved for negligent misrepresentation are set forth in the Restatement as follows:

§ 552. Information Negligently Supplied for the Guidance of Others

(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) . . . the liability stated in Subsection (1) is limited to loss suffered

(a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and

(b) through reliance upon it in a transaction that he intends the information to influence or knows that the

recipient so intends or in a substantially similar transaction.

[Restatement (Second) of Torts § 552 (1977).]

A jury could conclude that each of the appellees owed a duty to appellants to see that they received correct information on termite damage. There was evidence that the real estate agent assured appellants that the Boss & Phelps sales contract would protect them. Thus, they could be said to have voluntarily taken on a duty toward appellants. "[O]ne who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all." *Glanzer v. Shepard,* 233 N.Y. 236, 135 N.E. 275, 276 (1922), *quoted with approval in Security National Bank v. Lish,* D.C.App., 311 A.2d 833, 834 (1973) (attorney who did not exercise due care in informing bank of his client's financial status held liable to bank for negligent misrepresentation).

Evidence of Boss & Phelps' breach of duty was presented. For instance, it was Boss & Phelps who selected the termite company and gave Western instructions as to the scope of the inspection and report needed to satisfy the contract. Western claimed they followed their ·usual practice of reporting only on termite infestation because Boss & Phelps never notified them that their termite clearance report was expected to cover termite damage as well. If believed, this fact alone, failure to give adequate instructions, could constitute negligence. In addition, the real estate agent present at closing failed to point out to appellants that the termite report actually did not say there was no termite damage, despite the requirement of the contract. The jury might find that the agent showed less than the care and competence expected of one in the real estate business in failing to notice the discrepancy, or in failing to question whether the repair to a single beam took care of all damage.

As to the termite company's negligence, the trial court said Western owed no duty to appellants, but only to Mrs. Herman, the seller, because Mrs. Herman employed Western. The court reasoned that the duty owed stems from the employment contract, and since there was no privity of contract between Western and appellants, Western could not be liable to appellants. We reject this analysis. It has long been settled that privity of contract is no prerequisite to a buyer's recovery against an expert who misevaluates an object, where the expert knows a potential buyer will rely on the expert evaluation. In *Glanzer v. Shepard, supra,* a buyer sued public weighers hired by the seller of a shipment of beans for the excess money paid to the seller because of the weigher's mistake. Lack of privity was held to be no barrier to the recovery. This rule has been set out in Restatement (Second) of Torts § 552, *supra,* and has been followed in the District. *E. g., Security National Bank v. Lish, supra* ; *Long v. American Savings & Loan Ass'n,* D.C.Mun.App., 151 A.2d 770, 772–73 (1959).

The jury could find that Western breached its duty to appellants to exercise that care and competence in obtaining and communicating the information which its recipient is justified in expecting. Restatement (Second) of Torts § 552, *supra.* An expert in termite control who was familiar with reporting practices and requirements in the sale of residential property testified that a reasonably competent inspection should have revealed extensive termite damage and that the damage in places was visible and even very obvious. The expert also opined that Western's report was inadequate because it was too vague to give any idea of the existence or extent of damage. This testimony was sufficient to overcome a directed verdict for Western on the question of negligence.

The final issue * which the trial court covered in its grant of a directed

---

* Appellants raise a number of evidentiary issues which either have become moot or are unnecessary to decide at this time. We will, however, address one of these peripheral issues for the trial court's guidance on remand. Appellants were denied discovery of financial information about either defendant. They sought this information in order to present evidence to

verdict was punitive damages. Punitive damages properly may be awarded

"where the act of the defendant is accompanied with fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury." [*Franklin Investment Co. v. Homburg*, D.C.App., 252 A.2d 95, 98 (1969) *quoting McClung–Logan Equipment Co. v. Thomas*, 226 Md. 136, 147, 172 A.2d 494, 500 (1961).]

▮▮▮ Only if the jury were to find fraud would punitive damages be permissible. Moreover, since each of the defendants is a corporation, it must be shown that the wrongful act was authorized and ratified by the corporation, not merely perpetrated by an employee. *Lake Shore & Michigan Southern Railway v. Prentice*, 147 U.S. 101, 13 S.Ct. 261, 37 L.Ed. 97 (1883); *Franklin Investment Co., Inc. v. Smith*, D.C.App., 383 A.2d 355, 359 (1978); *Wardman–Justice Motors, Inc. v. Petrie*, 59 App.D.C. 262, 265, 39 F.2d 512, 515 (1930). One way to establish that the corporation was involved is to show that an executive officer of high rank participated in the misconduct. *Wardman–Justice Motors, Inc. v. Petrie, supra.* Appellants' evidence with regard to Mr. Connors' position at Boss & Phelps was a sufficient basis to award punitive damages against Boss & Phelps if fraud by Connors were shown. However, we agree with the trial court's assessment that Mr. Barrett at

Western was not such a highly placed employee as to be considered an executive officer of high rank, despite his title of district sales manager. Nevertheless, it would be possible for a jury to award punitive damages against Western via an alternative route, namely, if they believed that Western engaged in a general practice of fraud, and Barrett as their agent was carrying out corporate policy. *See General Motors Acceptance Corp. v. Froelich*, 106 U.S. App.D.C. 357, 359, 273 F.2d 92, 94 (1959). Thus, the jury could award punitive damages if it were to find fraud consisting not of an isolated scheme by Barrett to foist an innocuous termite clearance report on the Remeikises, but rather, fraud consisting of Western's general policy of reckless disregard for thorough and accurate termite clearance reports.

We express no opinion as to the existence of fraud or negligence, but conclude that the many issues of fact involving both defendants should be decided by a jury. Accordingly, we remand for further proceedings in accordance with this opinion.

*So ordered.*

---

help the jury decide the appropriate amount of punitive damages. Evidence of a joint tort feasor's financial standing is not admissible where liability cannot be apportioned. *Washington Gas Light Co. v. Lansden*, 172 U.S. 534, 19 S.Ct. 296, 43 L.Ed. 543 (1899); *Thomas v. Durham Motors, Inc.*, 389 S.W.2d 412, 414 (Mo. App.1965). While *compensatory* damages may not be apportioned among joint tort feasors in the District of Columbia, *see McKenna v. Austin*, 77 U.S.App.D.C. 228, 134 F.2d 659 (1943), there appears to be no prior decision whether *punitive* damages may be apportioned. Courts in other jurisdictions differ on this question. *See* Annot., 20 A.L.R.3d 666 (1968). We feel the better rule is that punitive damages may be apportioned among joint tort feasors because punitive damages must be related to the degree of culpability and the defendants' ability to pay if they are to carry their intended sanction.

*See Cheek v. J. B. G. Properties, Inc.*, 28 Md. App. 29, 44, 344 A.2d 180, 190 (1975). Therefore, evidence of each defendant's financial standing should be admissible. *State ex rel. Hall v. Cook*, 400 S.W.2d 39 (Mo.1966). To avoid confusion, a special verdict under Super. Ct.Civ.R. 49 could be employed to isolate the amount of damages against each defendant. *See United States Fidelity & Guaranty Co. v. Brian*, 337 F.2d 881, 882 (5th Cir. 1964), *cert. denied sub nom. Allan Herschell Co. v. United States Fidelity & Guaranty Co.*, 381 U.S. 913, 85 S.Ct. 1537, 14 L.Ed.2d 434 (1965) (multiparty litigation with complicated questions involving liability of several parties justifies submission of special interrogatories to jury); *Harding v. Evans*, 207 F.Supp. 852, 855 (D.C.Pa.1962) (case involving liability of many parties was ideal for use of special verdict).