JAMES E. BOASBERG, United States District Judge
As we enter a new year, a top priority is often to get in better shape. Plaintiff Valerie McMullen had that same goal in 2010 and (unlike so many of us) actually followed through. After her favorite trainer left her gym, however, she sought a refund for unused sessions. What she received instead were two bills with new personal-training charges she claims she never incurred. After unsuccessfully trying to straighten out these alleged errors, Plaintiff brought this action against the two creditor banks-Chase and Synchrony-as well as various individuals and companies associated with the gym. The Court previously granted in part the banks' Motion to Dismiss, but left intact McMullen's counts against them alleging fraud, conspiracy to defraud, and violations of D.C. consumer-protection law. See McMullen v. Synchrony Bank, 164 F.Supp.3d 77, 98 (D.D.C. 2016). Plaintiff and Defendant Chase now cross-move for summary judgment on these remaining claims. Finding no genuine issue of material fact for trial, the Court will grant Chase's Motion.
*298 I. Background
In cross-moving for summary judgment here, the parties largely agree on the material facts. The Court, accordingly, recounts those that are undisputed, while noting specific disagreements about others.
A. Factual History
Although Chase is the only Defendant implicated in this Opinion, some background regarding the others is helpful. In 2008, Chase rolled out a program, ChaseHealthAdvance, which offered a revolving line of credit "for the purpose of financing and facilitating the payment of the medical costs of various ... procedures." Def. MSJ, Exh. 1-B (2008 Chase Provider Agreement) at 1; id., Exh. 1 (Declaration of Jennifer Heald), ¶ 5. "ChaseHealthAdvance offered accountholders no-interest financing to obtain services from Chase-accepted providers." Heald Decl., ¶ 6. As part of the application to become a provider, a business listed a doctor's name and valid medical-license number, id., ¶ 9, and also agreed to adhere to certain terms and conditions, including promptly submitting to Chase an invoice for all customer purchases financed through ChaseHealthAdvance. See 2008 Provider Agreement at 1; Heald Decl., Exh. D (2011 Chase Provider Agreement) at 2. The provider could either mail such invoice with the customer's signature, or (as is often the case in the digital age) remit it electronically. See 2008 Provider Agreement at 1. If a provider chose the latter route, it agreed to "retain a copy of the original, signed Invoice for a period of four years from the date of completion or delivery set forth on the Invoice." Id. In the event of a customer dispute regarding a transaction, providers had to submit the signed invoice within ten business days or pay Chase the full amount of the disputed charge. Id.
On November 10, 2008, Chase entered into a provider agreement with Bullen Wellness, a joint venture between two business associates, Karim Steward and Wayne Bullen. See Def. MSJ, Attach. 2 (Defendant's Statement of Undisputed Material Facts), ¶ 3. Steward owned a gym, One World Fitness, and Bullen owned a chiropractic practice, Washington Chiropractic. See Pl. MSJ, Attach. 3 (Plaintiff Statement of Undisputed Material Facts), ¶ 17. Bullen Wellness's provider-enrollment form listed Dr. Bullen's chiropractor license number and the same address and phone number associated with One World Fitness. Id., ¶¶ 22, 24. It should be noted, however, that Chase had no official relationship with the gym. See Def. SUMF, ¶ 78; Def. Reply, Exh. 19 (Deposition of Valerie McMullen) at 259-60.
In September 2010, McMullen began attending personal-training sessions at One World Fitness. See Pl. SUMF, ¶ 63. She purchased 54 sessions in advance at a cost of $5,040 and decided to apply for a ChaseHealthAdvance account to pay for them. Id., ¶ 63. Steward asked her a series of questions, answers to which he entered into the electronic application on his computer's Chase portal. See McMullen Depo. at 78. McMullen was approved with a credit limit of $12,000 and signed a purchase-verification form, per Chase policy. Id. at 82-83. The following month she received a billing statement from Chase with a charge of $5,040 from Bullen Wellness. See McMullen Depo. at 109-10. Plaintiff made payments on her balance without issue. Having exhausted her 54 sessions by December 2010, she then purchased 150 additional training sessions (50 weeks), which she charged on a personal credit card. See Pl. SUMF, ¶ 72.
All was well until September 2011. On September 21, McMullen had a conversation with Steward wherein she stated that *299 she would renew her membership for another year so long as her preferred trainer was working there. See McMullen Depo. at 156:13-18, 161:5-22. (Defendant Steward disputes that this conversation happened, but Chase-the only Defendant in these Motions-does not.) The next day, however, One World Fitness terminated this trainer. See McMullen Depo. at 147. Plaintiff promptly informed the gym the following day that she wished to cancel her membership and requested a refund for the remaining three months for which she had prepaid in December 2010. See Pl. SUMF, ¶ 73. Instead of obtaining a refund, however, when McMullen received her Chase bill the following month, she saw a new charge for $1,000 from Bullen Wellness. See McMullen Depo. at 174:2-5, 182:9-22. Believing this was unauthorized, Plaintiff called Chase on November 1, 2011, to dispute it. See Heald Decl., Exh. U (Call Log). (The parties disagree as to whether McMullen authorized the charge in the first instance. See Def. Reply, Attach. 1 (Response to Plaintiff Statement of Undisputed Material Facts), ¶ 1.) The Chase representative asked her for her email address so that he could email her a dispute form, which he did on November 4. See Def. SUMF, ¶¶ 54, 58. McMullen never returned the dispute form or submitted to Chase any other written grievance. Id., ¶¶ 61, 64. She continued making payments to Chase and paid off the $1,000 balance on June 8, 2012. Id., ¶ 65.
B. Procedural History
On September 12, 2014, Plaintiff filed this suit in the Superior Court for the District of Columbia. See ECF No. 1 (Notice of Removal) at 1. She named Steward and Bullen; their companies (One World Fitness, Bullen Wellness, and Washington Chiropractic); two banks, Synchrony and Chase; and a handful of unnamed individuals and corporate entities as Defendants. Id., Attach. 1 (Complaint), ¶¶ 1, 6-14. The Complaint raised a bevy of claims against these Defendants-viz. , violations of the D.C. Consumer Protection Procedures Act, civil conspiracy, common-law fraud, conversion, breach of contract, breach of good faith and fair dealing, vicarious liability, and punitive damages. Id., ¶¶ 36-83. McMullen later amended her Complaint to include class-action claims, seeking relief on behalf of a putative class of "all One World Fitness customers who received financing from the Bank Defendants." Notice of Removal at 2. Chase then successfully removed the suit to federal court pursuant to the diversity-removal provisions of the Class Action Fairness Act. See ECF No. 55 (Memorandum Opinion and Order denying remand).
On September 23, 2015, Chase moved to dismiss the claims asserted against it-specifically, violations of the CPPA, fraud and conspiracy under D.C. common law, and punitive damages. See ECF No. 57 (MTD). Defendant Synchrony also joined this Motion. See ECF No. 63 (Notice of Joinder). Plaintiff opposed the Motion and sought leave to amend her Complaint a second time. See ECF Nos. 65 (Opposition to MTD), 70 (MTA). On February 16, 2016, the Court granted Plaintiff leave to amend her Complaint, but also granted Chase's Motion to Dismiss as to Count VII (punitive damages). See McMullen, 164 F.Supp.3d at 98. Using the proposed Second Amended Complaint as the operative document, the Court determined that Plaintiff had stated a claim for the substantive counts against the banks-violations of the CPPA (Count I), and fraud and conspiracy to commit fraud (Count III). After nearly a year of discovery, Chase filed this Motion for Summary Judgment. Plaintiff cross-moved, and the Motions are now ripe.
*300 II. Legal Standard
"When faced with cross-motions for summary judgment, th[e C]ourt must review each motion separately on its own merits 'to determine whether either of the parties deserves judgment as a matter of law.' " Family Trust of Mass., Inc. v. United States, 892 F.Supp.2d 149, 154 (D.D.C. 2012) (quoting Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003) ). If the Court determines that one party is not entitled to summary judgment, it "changes tack on the cross motion and gives the unsuccessful movant 'all of the favorable factual inferences that it has just given to the movant's opponent.' " Nucap Indus., Inc. v. Robert Bosch LLC, 273 F.Supp.3d 986, 998, 2017 WL 1197104, at *6 (N.D. Ill. 2017) (quoting R.J. Corman Derailment Servs., LLC v. Int'l Union of Operating Engrs., Local Union 150, 335 F.3d 643, 647-48 (7th Cir. 2003) ). It is nonetheless still possible for a court to deny summary judgment to both sides.
Summary judgment is appropriate "only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed." Airlie Foundation v. IRS, 283 F.Supp.2d 58, 61 (D.D.C. 2003) (citing Rhoads v. McFerran, 517 F.2d 66, 67 (2d Cir. 1975) ); see also Fed. R. Civ. P. 56(a) ; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ; CEI Wash. Bureau, Inc. v. DOJ, 469 F.3d 126, 129 (D.C. Cir. 2006). A fact is "material" if it is capable of affecting the substantive outcome of the litigation. See Liberty Lobby, 477 U.S. at 248, 106 S.Ct. 2505 ; Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. See Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007) ; Liberty Lobby, 477 U.S. at 248, 106 S.Ct. 2505 ; Holcomb, 433 F.3d at 895. "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).
In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [its] favor." Liberty Lobby, 477 U.S. at 255, 106 S.Ct. 2505 ; see also Mastro v. PEPCO, 447 F.3d 843, 850 (D.C. Cir. 2006) ; Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) (en banc ). The Court must "eschew making credibility determinations or weighing the evidence." Czekalski v. Peters, 475 F.3d 360, 363 (D.C. Cir. 2007). To defeat summary judgment, however, an opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. See Fed. R. Civ. P. 56(e) ; Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The non-movant is required to provide evidence that would permit a reasonable jury to find in its favor. Laningham v. Navy, 813 F.2d 1236, 1242 (D.C. Cir. 1987). If the non-movant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. Liberty Lobby, 477 U.S. at 249-50, 106 S.Ct. 2505.
III. Analysis
Plaintiff alleges fraud based on the $1,000 charge from Bullen Wellness that appeared on her October 2011 billing statement. The same transaction also underlies *301 her claim that Chase violated multiple sections of the D.C. CPPA. The Court addresses each count in turn.
A. Fraud
To establish fraud, a plaintiff must show, by clear and convincing evidence, that the defendant made "(1) a false representation (2) in reference to a material fact, (3) [ ] with knowledge of its falsity [and] (4) the intent to deceive, and (5) action is taken in reliance upon the representation." Va. Acad. of Clinical Psychologists v. Grp. Hospitalization & Med. Servs., Inc., 878 A.2d 1226, 1233 (D.C. 2005) (quoting Atraqchi v. GUMC Unified Billing Servs., 788 A.2d 559, 563 (D.C. 2002) ). When, as here, the issue involves a commercial contract negotiated at arm's length, the party alleging fraud must also show that any reliance was reasonable. Hercules & Co., Ltd. v. Shama Restaurant Corp., 613 A.2d 916, 923 (D.C. 1992). As Plaintiff cannot establish the great majority of these elements, this count does not survive.
1. False Representation
False representations encompass both affirmative misstatements and willful omissions "when a duty to disclose that fact has arisen." Saucier v. Countrywide Home Loans, 64 A.3d 428, 438 (D.C. 2013) (quoting Rothenberg v. Aero Mayflower Transit Co., 495 F.Supp. 399, 406 (D.D.C. 1980) ); see id. at 439 ("[M]ere silence does not constitute fraud unless there is a duty to speak.") (alteration in original) (quoting Kapiloff v. Abington Plaza Corp., 59 A.2d 516, 517 (D.C. 1948) ). McMullen alleges both types of false representations here.
a. False Statements
Plaintiff first contends that, by sending her a billing statement listing the September 21, 2011, $1,000 charge from Bullen Wellness, Chase falsely represented that she had authorized such charge and was legally obligated to pay. See SAC, ¶ 75; Pl. MSJ at 23. The undisputed facts say otherwise. Both sides agree that: (1) Bullen Wellness submitted a charge for $1,000 on September 21, 2011, and (2) Chase sent a billing statement to McMullen reflecting that charge. See Pl. SUMF, ¶¶ 78, 84; Heald Decl., Exh. T (October 2011 Billing Statement); Def. SUMF, ¶¶ 42-43, 46. Nowhere, however, does the bill state that McMullen authorized the charge. In fact, she admitted as much in her deposition. See McMullen Depo. at 181:19-21 ("Q: Does it say anywhere [on the billing statement] that you authorized this charge? A: No.").
A typical credit-account statement simply sets out "the amount of the purchases ... charged to [an] account[ ] that month, the total balances outstanding in the account[ ] and any 'finance charges' levied on the balances." Bryson v. Bank of N.Y., 584 F.Supp. 1306, 1308 (S.D.N.Y. 1984). Lenders, such as Chase, that allow an accountholder to use a line of credit at a point-of-sale merchant, initially presume that charges submitted by the merchant are authorized. The billing statement reflects those purchases and provides the customer an opportunity to correct any mistakes. To wit, Plaintiff's credit statements and her Chase Account Holder Agreement both include a "billing rights summary" section, providing direction if she "find[s] a mistake" on the statement. See Heald Decl., Exh. P (McMullen Account Agreement) at 6; October 2011 Billing Statement at 4. Chase is, in fact, required by law to provide customers a method by which they can dispute erroneous charges. See 15 U.S.C. § 1637(b)(10) (requiring creditors to disclose address on billing statements customers can use to assert billing errors). And a Chase customer who disputes a *302 charge is not legally obligated to pay it while the bank investigates. See Account Agreement at 5. While Chase may have represented that Bullen Wellness charged her account $1,000, the bank never represented via the statement that such charge was authorized. Nor did Chase represent that she categorically had to pay the $1,000, as the statement provided clear and conspicuous instructions for disputing an incorrect charge.
Plaintiff additionally maintains that Chase "falsely represented to [her] through its marketing materials that One World Fitness was approved as a Chase Health Advance provider when it was not," based on a letter Steward gave her upon joining One World Fitness. See Pl. MSJ at 26, id., Exh. 3 (Welcome Letter). Again, her contentions are not borne out by the record. The welcome letter, which included both the ChaseHealthAdvance and One World logos, offered new gym members a free preliminary chiropractic screening with Dr. Bullen. Certainly, the face of the letter suggests a relationship between Chase and One World Fitness when no such link existed. Yet it was One World, not Chase, that implied such a relationship. See Welcome Letter (displaying ChaseHealthAdvance logo on top left of page but bearing Steward's signature). No evidence suggests that Chase encouraged, approved, or even knew of One World Fitness's use of its logo. True, the bank did provide a customizable welcome-letter template for its providers to use "to inform [their] patients of the payment options available to them." Heald Decl., Exh. K (2010 Chase Provider Handbook) at 14; see Def. Reply, Exh. 22 (Deposition of Jennifer Heald) at 182:16-19 (stating that Chase gave providers a "template mainly to make sure that all of the disclosures that need to be on and provided to patients are provided so that way they don't use the terminology without the disclosure"). Chase, however, never saw or approved of the One World Fitness letter, and it did not have any contractual agreement with One World that would permit the gym to use the Chase logo. See Def. Reply, Exh. 20 (Deposition of Dr. Wayne P. Bullen) at 465:8-12; id., Exh. 21 (Deposition of Karim Steward) at 255:10-21; Provider Handbook at 13 ("Any materials containing the ChaseHealthAdvance logo must be approved by ChaseHealthAdvance."). Plaintiff has not shown how Chase improperly represented that it had any relationship with One World.
b. Omissions
According to McMullen, not only was the $1,000 charge itself a false representation, but Chase's handling of her dispute also led to several "willful omissions," including that: (1) it "had issued a line of credit" in her name; (2) it did not "possess any signed documentation permitting Chase to issue" the second line of credit and process the $1,000 charge; (3) it ran a credit check on [her] on September 21, 2011, without her authorization; (4) "One World Fitness was not an approved provider" and; (5) "personal training session could not be financed through the Chase Health Advance program." Pl. MSJ at 26-27. These allegations hold no water.
As a threshold matter, none of these purported omissions are included in the Second Amended Complaint. Although Plaintiff pled willful omissions by Defendants Bullen and Steward, she listed only affirmative misrepresentations by Chase. See SAC, ¶ 75. Adding omissions as a source of fraud via her Cross-Motion-which claim requires as an additional element a duty to disclose-"amounts to a fundamental change in the nature of" this count. Teltschik v. Williams & Jensen, PLLC, 683 F.Supp.2d 33, 42 (D.D.C. 2010). "It is well established that a party may not *303 amend its complaint or broaden its claims through summary judgment briefing." Dist. of Columbia v. Barrie, 741 F.Supp.2d 250, 263 (D.D.C. 2010). The Court could grant Chase summary judgment as to her willful-omission claims on that basis alone.
Even if Plaintiff had properly alleged such conduct, she would still come up short on the merits. The first two purported omissions-that Chase opened a second unauthorized line of credit in her name and did so without any signed documentation-are the bases for several of McMullen's claims throughout the Complaint. The record, however, does not support that Chase approved, opened, or authorized a second line of credit. Plaintiff premises this allegation largely (if not solely) on a document generated from the ChaseHealthAdvance portal to Bullen Wellness (but not to her) on September 21, 2011, stating that her "application for credit has been approved" in the amount of $10,293. See Pl. MSJ, Exh. 15 (Credit Approval Notification). Given that she denies ever giving authorization for a line of credit on that date and that Chase has been unable to produce any document with her signature showing that she did, the claim seems plausible at first blush. Indeed, the Court so found in the prior Opinion, noting that she had "alleged enough facts to clear the motion-to-dismiss standard." McMullen, 164 F.Supp.3d at 96. Discovery, however, has not put flesh on these bones, and there are no facts in dispute that would create an issue for trial.
Chase's designee testified that, though the document uses the word "application," it was not a "new credit application." Heald Depo. at 81:15-20. Instead, because McMullen had an existing account older than 90 days, Chase "would check the [customer's] credit before" a new transaction would be processed. Id. at 82:11-16, 111:6-8. The Court may not, of course, weigh conflicting evidence on a motion for summary judgment, and, because it ultimately grants Chase's Motion, Plaintiff's "evidence is to be believed, and all justifiable inferences are to be drawn in [her] favor." Liberty Lobby, 477 U.S. at 255, 106 S.Ct. 2505. Extrapolating from this document that Chase opened a line of credit is, however, not a "justifiable inference" when looking at the totality of the record. Instead, the only reasonable inference is that the notification was the result of Chase's inquiry into McMullen's continued creditworthiness.
McMullen authorized Steward to apply for a ChaseHealthAdvance account in her name in September 2010. See Pl. SUMF, ¶ 63; McMullen Depo. at 75-79. Chase approved her for an account with a limit of $12,000 and assigned an account number ending in 5058. See Heald Decl., Exhs. F (McMullen Approval), M (September 2010 Billing Statement). In September 2011, before Bullen Wellness submitted the $1,000 charge, her previous balance on the open account was $1,707, leaving her an available credit amount of $10,293. Id., Exh. Y (September 2011 Billing Statement). Her available credit in September 2011 corresponds to the amount listed on the controversial notification that was generated in response to Steward's September 21 charge. See Credit Approval Notification (listing approved amount as $10,293). The $1,000 charge was posted to the account McMullen concedes is authorized, the account ending in 5058. See October 2011 Billing Statement at 1.
The question remains, however, of why Bullen Wellness received a credit-approval notification. Creditors may request a consumer credit report for their current accountholders without their permission before processing certain transactions, which is what the record shows happened here. See 15 U.S.C. § 1681b(a)(3)(F) (credit-reporting *304 agencies may provide consumer-credit reports when requested "(i) in connection with a business transaction that is initiated by the consumer, or (ii) to review an account to determine whether the consumer continues to meet the terms of the account"). The only reasonable inferences to draw from the undisputed facts are that the notification to Bullen Wellness was the result of a credit check by Chase in response to the $1,000 charge, and that the only ChaseHealthAdvance account Plaintiff had was the one she authorized ending in 5058. The (perhaps inartfully titled) "credit approval" represents the bank approving the transaction, not a separate account. See Heald Depo. at 111. Given that there is no "unauthorized" line of credit from Chase, there can be no willful omission of such line.
Plaintiff's second alleged omission also appears to include a claim that Chase failed to tell her that it did not have documentation showing that she had authorized the $1,000 charge. Her position that the bank representative should have disclosed this information during the November 1 phone call with her, see Pl. MSJ at 27, is, however, incorrect. Under Chase's policies, the provider was responsible for retaining a signed copy of the receipt, which the bank would request in the event it received a written dispute. See Heald Depo. at 166:4-10. Because McMullen never submitted her billing dispute in writing, any duty Chase had to disclose a receipt was never triggered. Id. at 166:18-22; cf. Dawkins v. Sears Roebuck & Co., 109 F.3d 241, 243 (5th Cir. 1997) ("To trigger a creditor's [federal] obligation to investigate and verify the disputed billing statement, a consumer must send written notice to a creditor of the alleged error.").
McMullen's third alleged omission is similarly deficient. Her claim that Chase committed fraud by omitting that it had checked her credit before approving the $1,000 transaction fails because the bank had no duty to disclose that information. See Sundberg v. TTR Realty, LLC, 109 A.3d 1123, 1131 (D.C. 2015) (omissions are not actionable absent duty to speak). "A duty to disclose does not normally arise when parties are engaged in an arm's length transaction" but "may arise (1) if the fact is material and the one concealing has superior knowledge and knows the other is acting upon the assumption that the fact does not exist; or (2) if one party takes actions which divert the other party from making prudent investigations." Bank of Montreal v. Signet Bank, 193 F.3d 818, 829 (4th Cir. 1999) (citations omitted). McMullen does not argue that either circumstance is present here. Federal law expressly permits a lender to obtain a consumer's credit report when it "intends to use the information in connection with a credit transaction involving the consumer ... and involving the ... review of ... an account[ ] of the consumer." 15 U.S.C. § 1681b(a)(3)(A) ; see id. § 1681b(a)(3)(F) (permitting credit check "to review an account to determine whether the consumer continues the meet the terms of the account"). Consumer authorization is not needed for such credit inquiries, and Plaintiff has not explained why a credit check would be material such that Chase should have disclosed it to her. See Cooper v. Pressler & Pressler, LLP, 912 F.Supp.2d 178, 188 (D.N.J. 2012).
Plaintiff's two remaining omissions claims-i.e. , that One World Fitness was not an approved provider, and gym services could not be financed through ChaseHealthAdvance-are equally unsuccessful. As to the former, Chase does not have a duty to disclose every entity with which it does not have a business relationship. Chase's contractual relationship was with Bullen Wellness, not One World Fitness.
*305 See Heald Decl., Exh. A (Bullen Wellness Provider Enrollment Form). Bullen Wellness was the provider listed on ChaseHealthAdvance accounts, and all remitted money was deposited into Bullen Wellness's accounts. See Pl. MSJ, Exh. 16 (Chase Funding Report for Bullen Wellness); Steward Depo. at 34:1-12. Chase testified that it had no relationship with One World, see Heald Decl., ¶ 22, and McMullen has not put forth anything beyond speculation from which a reasonable juror could infer one. As to the latter, Chase stated that fitness training was not an impermissible use of a ChaseHealthAdvance account. See Heald Depo. at 188:8-21. Plaintiff's willful-omission claims regarding One World Fitness, therefore, fail as there was nothing for Chase to omit. Because no reasonable jury could conclude that the bank made an affirmative misstatement or willful omission, it is entitled to summary judgment on that count. See Bennett v. Kiggins, 377 A.2d 57, 61 (D.C. 1977) (affirming summary judgment for defendant when plaintiff could not show a misstatement or omission).
2. Statement of Fact
Additionally, her claim that "Chase falsely represented that [she] was legally obligated to pay it a total of $1,000," SAC, ¶ 75, is independently deficient because this statement was legal, not factual. As a general rule, "fraud cannot be predicated on misrepresentations as to the legal effect of a written instrument." Ellis v. J.P. Morgan Chase & Co., No. 12-3897, 2016 WL 5815733, at *7 (N.D. Cal. Oct. 5, 2016) (alteration omitted) (quoting 37 Am. Jur. 2d Fraud & Deceit § 102 (2016) ); see Perkins v. Nash, 697 F.Supp. 527, 534 (D.D.C. 1988) ("[A] misrepresentation of law is ordinarily not a basis for fraud."). Even if Chase was indeed mistaken that McMullen owed it $1,000, such a misrepresentation is "not actionable" as fraud because it is "nothing more than Chase's legal opinion of the effect of the terms of the [accountholder] agreement." Ellis, 2016 WL 5815733, at *7 ; see Falconi-Sachs v. LPF Senate Square, LLC, 142 A.3d 550, 555 (D.C. 2016) (fraud claims properly dismissed because "alleged misrepresentation is in essence an alleged misrepresentation of law, not a misrepresentation of fact"). Aassuming a reasonable juror could make a factual finding that the bill falsely represented an authorized charge of $1,000, any representation by Chase that Plaintiff was obligated to pay the charge is an incorrect legal conclusion, not a factual falsehood, and cannot support a fraud claim. Falconi-Sachs, 142 A.3d at 555 ; see Ellis, 2016 WL 5815733, at *7.
3. Knowledge
Yet another infirmity in this count lies with proof of Chase's knowledge. Fraud liability under D.C. law does not require actual knowledge; rather, a plaintiff can prevail by showing that the defendant made "a false representation recklessly without knowing" its veracity. Remeikis v. Boss & Phelps, Inc., 419 A.2d 986, 990 (D.C. 1980). Relying on this recklessness standard, McMullen appears to argue that Chase engaged in such behavior by insisting that she pay the charge instead of investigating it. See SAC, ¶ 75. Chase had no reason to investigate, however, because Plaintiff never submitted her dispute in writing as she was required to do. The record simply does not support her allegations that Chase knew or should have known that the $1,000 charge from Bullen Wellness was not purportedly authorized.
4. Intent
Neither does the record bear any evidence that Chase intended to deceive McMullen. Intent can be "inferred *306 from 'reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation.' " Djourabchi v. Self, 571 F.Supp.2d 41, 50 (D.D.C. 2008) (quoting Gen. Elec. Capital Corp. v. Acosta, 406 F.3d 367, 372 (5th Cir. 2005) ). Plaintiff relies on the following to show fraudulent intent: (1) Chase ignored its credentialing protocols when it approved Bullen Wellness as a provider; (2) it ignored complaints from One World Fitness customers; and (3) it required individuals to dispute charges in writing. See Pl. MSJ at 28-29. None of these assertions creates a triable issue of fact regarding Defendant's intent.
First, Chase testified that it ensured that a doctor with a valid medical license submitted Bullen Wellness's application, and it re-verified that information annually. See Heald Depo. at 61:14-16, 199:5-7. Plaintiff does not dispute that Dr. Bullen's chiropractic license was valid, see Pl. SUMF, ¶ 22, but maintains that Chase should have conducted a more thorough background investigation. That hardly equates to recklessness or an intent to deceive.
There is also no evidence to support Plaintiff's assertion that Chase ignored complaints from Bullen Wellness customers. She bases her argument on a random selection of ten ChaseHealthAdvance accountholders that Chase produced for litigation. See Pl. MSJ at 29. Although five Bullen Wellness customers requested refunds, none of them alleged that they had not initially authorized the charge. See Heald Decl., ¶ 66. The four people who submitted their grievance in writing (as required under the account agreement) requested refunds because they never received or no longer needed the charged services. Id., ¶¶ 67-70. And they all got their money back. Id. In fact, McMullen testified that she never believed that "Chase intended to harm her." McMullen Depo. at 16:7-9. Defendant had no reason to be on notice regarding any alleged fraud by Bullen Wellness, and no reasonable jury could find that it intended to deceive McMullen.
Finally, McMullen cannot use Chase's dispute policies as evidence of intent to defraud. Chase, like many credit-account issuers, requires that customers submit any disputes in writing. Federal law also sanctions this practice. See 15 U.S.C. § 1666(a). Lenders have good reason for doing so: "The facts surrounding each individual dispute vary widely, and it is important that [the bank] have an immutable record of the facts in the customer's own words so that [it] can convey to the merchant an accurate description of the customer's dispute." Heald Decl., ¶ 33. Plaintiff agreed to these terms when she signed up for the account in 2010 and saw them on each billing statement, see 2010 Account Holder Agreement at 8; McMullen Depo. at 112-13, and thus they were not, as she claims, used to "strong-arm ... consumers into making payments." Pl. Reply at 14. Requiring that customers submit disputes in writing is a reasonable business practice, not evidence of fraudulent intent.
5. Reliance
Last, Chase is entitled to summary judgment on the fraud count because Plaintiff's reliance (if any) on the billing statement in these circumstances was unreasonable. See Regan v. Spicer HB, LLC, 134 F.Supp.3d 21, 36 (D.D.C. 2015) (reliance in commercial-contract disputes negotiated at arm's length must be reasonable). The Complaint alleges that McMullen "justifiably relied on Defendant Chase's false representation that she was obligated to make payment, ultimately paying the full $1,000 demanded by [Chase]." SAC, ¶ 75. When Plaintiff noticed the $1,000 *307 charge, however, she knew it was erroneous and thus promptly called Chase to dispute it. The representative told her that in order to investigate, she must submit a written dispute form, which he emailed to her. The same requirement was clearly spelled out on her billing statement. See Billing Statement at 4 ("If you think there is an error on your statement, write to us on a separate sheet at [address].... You must notify us of any potential errors in writing. You may call us, but if you do we are not required to investigate any potential errors and you may have to pay the amount in question."). Despite being aware of Chase's dispute-mechanism policies, Plaintiff never submitted a written dispute to Chase and paid off the charge. See McMullen Depo. at 112-113, 190:12-18. Had she simply submitted her grievance in writing, she would not have had to pay anything pending an investigation by Chase. See Billing Statement at 4 (stating that Chase "cannot try to collect the amount in question, or report you as delinquent on that amount" while investigating). McMullen's subsequent payment of a charge she knew to be improper was thus not reasonable. See Regan, 134 F.Supp.3d at 36.
B. Conspiracy
Count III also includes a claim for conspiracy to commit fraud. Common-law conspiracy in D.C. requires "(1) an agreement between two or more persons (2) to participate in an unlawful act, and (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement pursuant to, and in furtherance of, the common scheme." Paul v. Howard Univ., 754 A.2d 297, 310 (D.C. 2000). Conspiracy is not, therefore, "an independent tort." Hill v. Medlantic Health Care Grp., 933 A.2d 314, 334 (D.C. 2007) (citation omitted). As Plaintiff here relies on the underlying fraud claim-which was just deemed insufficient-her conspiracy claim must also founder. See Ali v. Mid-Atl. Settlement Servs., Inc., 640 F.Supp.2d 1, 9 (D.D.C. 2009) (failure to prove underlying fraud fatal to conspiracy count).
C. D.C. CPPA
Next up is Count I, which alleges that Chase violated eight provisions of D.C. consumer-protection law. Unlike common-law fraud, a plaintiff need not prove scienter or intent to show a violation of the CPPA. See Fort Lincoln Civic Ass'n v. Fort Lincoln New Town Corp., 944 A.2d 1055, 1073 & n.20 (D.C. 2008). Rather, she need only show that the merchant violated the statutory elements. Saucier, 64 A.3d at 442. The CPPA "establishes an enforceable right to truthful information from merchants about consumer goods and services that are or would be purchased, leased, or received in the District of Columbia." D.C. Code § 28-3901(c). It is a remedial statute to be construed broadly but through the lens of a "reasonable consumer." Saucier, 64 A.3d at 442. The substance of most of Plaintiff's claims has already been debunked in the fraud analysis above, see Section III.A.1, supra , but the Court analyzes them here under the more lenient CPPA standard.
1. § 28-3904(b)
Section 28-3904(b) prohibits a merchant from representing that it "has a sponsorship, approval, status, affiliation, certification, or connection" that it does not actually have. Arguing that Chase violated this section by representing a relationship with One World Fitness that it did not have, McMullen points to the welcome letter she received from Steward when she joined the gym. See Pl. MSJ at 20-21. As described above, however, that letter-which Defendant did not approve or have knowledge of-is not evidence that Chase *308 represented any affiliation with One World. See Section III.A.1.a, supra.
Plaintiff nonetheless attempts to find a way to pin Steward's letter on Chase by stating that the bank stood idly by even as customers complained about unauthorized charges from One World. See Pl. MSJ at 21-22. Unfortunately for her, she has her chronology backwards. Steward gave her the letter when she applied for the ChaseHealthAdvance account in 2010. None of the disputes appearing in the record regarding other complaints, however, appear before 2011-the same year that Plaintiff brought her own claim. See Heald Decl., Exhs. Z-GG. McMullen cannot impute a duty on Chase to investigate unauthorized uses of its logo a full year before any recorded disputes.
Plaintiff next tries to tie her October 2011 billing statement to a § (b) claim, alleging that "Chase represented ... in the ... billing statement that the personal training services were approved of by the Chase Health Advance program, despite the clear internal mandate that personal training services could not be financed through the [program]." Pl. MSJ at 22. The record is devoid of any "clear internal mandate" prohibiting gym services from being financed through ChaseHealthAdvance. Indeed, Chase testified to just the opposite. See Heald Depo. at 188:12-14. Simply put, there is no genuine dispute for trial that Chase made a false representation of affiliation or approval.
2. §§ 28-3904(e), (e-1), (f-1), (p), (u)
The Court groups the next set of violations together, as they all deal with the same underlying issue: the October 2011 billing statement. Section 3904 imposes liability on a merchant who:
(e) misrepresent[s] as to a material fact which has a tendency to mislead;
(e-1) [r]epresent[s] that a transaction confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; ...
(f-1) [u]se[s] innuendo or ambiguity as to a material fact, which has a tendency to mislead; ...
(p) falsely state[s] or represent[s] that repairs, alterations, modification, or servicing have been made and receiving remuneration therefor when they have not been made ...; [or]
(u) represent[s] that the subject of a transaction has been supplied in accordance with a previous representation when it has not.
McMullen levels much the same argument here as with her common-law fraud claim discussed above. According to her, Chase misrepresented (1) "in the October 2011 billing statement that [she] authorized a charge for 'Bullen Wellness Washington DC' on September 21, 2011, in the amount of $1,000"; (2) "that the charge was authorized and payment [was] due on that charge"; (3) that she had "received goods and services from Bullen Wellness on September 21"; and that (4) it would help her "disput[e] the charge and that a fraud investigation had been opened." Pl. MSJ at 17-23. As with the fraud claim, the allegations here rest on an inaccurate depiction of what a bill represents. A credit statement only details what charges have been submitted to the lender. It does not represent that the accountholder authorized a charge or that services were rendered, only that a merchant charged the borrower's account. If all bills simply were indisputable representations of obligations, there would be no need for billing-dispute mechanisms and procedures. True, the Court did note in the prior Opinion that a bill listing unauthorized charges "undoubtedly tend[s] to mislead, as consumers generally *309 assume that the charges listed in billing statements they receive represent debt they previously authorized and now owe." McMullen, 164 F.Supp.3d at 94. That observation, however, was made in the context of a Motion to Dismiss, in which a court is typically limited to considering only the complaint and documents attached or incorporated therein. See EEOC v. St. Francis Xavier Parochial Sch., 117 F.3d 621, 624 (D.C. Cir. 1997). Now, with the benefit of discovery, the Court concludes that the billing statement at issue here would not have misled a reasonable consumer because it was accompanied by straightforward procedures explaining how customers could dispute mistakes on their bill and the bank did not demand payment for a disputed charge during any investigation.
McMullen's bill stated-as did the Chase representative with whom she spoke-that the only way for Chase to investigate a billing dispute is by Plaintiff's submitting it in writing. It strains credulity to think that a reasonable consumer would be misled by the billing statement in the way McMullen alleges given Chase's clear and visible dispute-resolution policies. The bank is thus entitled to summary judgment on Plaintiff's §§ 28-3904(e) and (e-1) claims. See Saucier, 64 A.3d at 442 (summary judgment appropriate on § 28-3904(e) claim when plaintiff failed to established affirmative or implied misrepresentation). Further, because McMullen does not argue in her brief how Defendant used "innuendo or ambiguity," the § (f-1) claim based upon that conclusory allegation similarly fails. See Liberty Lobby, 477 U.S. at 249-50, 106 S.Ct. 2505. Finally, because a bill only represents a charge, not that the actual good or service has been received, the Court grants Chase summary judgment on subsections (p) and (u) as well.
3. § 28-3904(f)
Subsection (f) prohibits merchants from "fail[ing] to state a material fact if such failure tends to mislead." Here, Plaintiff relies on seven omissions Chase purportedly made, all of which the Court has already discussed. See Sections III.A.1, III.C.1, supra. Specifically, she claims that Chase failed to disclose that it: (1) processed and approved the "unauthorized line of credit"; (2) did not have a signed application or written authorization for the "unauthorized line of credit"; (3) did not have "documentation validating the" line of credit and charge; (4) performed a credit check; (5) had not approved One World Fitness as a provider; (6) had approved Bullen Wellness to provide chiropractic services; and (7) had not approved personal-training services under the ChaseHealthAdvance program. See Pl. MSJ at 20.
Unlike common-law fraud, " D.C. Code § 28-3904(f) does not require a plaintiff to plead and to prove a duty to disclose information." Saucier, 64 A.3d at 444. That does not help McMullen, however, because the omissions of which she complains either concern factually inaccurate allegations or were incapable of misleading a reasonable consumer. The first three alleged omissions are grounded in the purported second, unauthorized line of credit. By now, it is clear that this "second" line of credit cannot support a CPPA violation because it never existed. The only charges Plaintiff incurred on her ChaseHealthAdvance account were for the account ending in 5058, which she admits to opening.
The third omission also alleges that Chase never produced authorization for the $1,000 charge. Factually, McMullen is correct that Chase has not been able to provide documentation showing that she approved the charge. See Heald Depo. at 106-107. As discussed above, however, a *310 disputed charge in the context of the entire statement does not "tend[ ] to mislead." D.C. Code 28-3904 § (f). Chase had clear procedures that accountholders could use to dispute charges, of which Plaintiff was aware but inexplicably did not follow. There is no genuine dispute for trial, therefore, about the first three alleged omissions.
Next, Chase did check Plaintiff's credit without her permission before approving the $1,000 charge-which it is legally permitted to do. Again, however, McMullen never specifies what exactly was misleading about that practice. See Pl. MSJ at 20 (noting only that "[i]t is undisputed that Chase failed to disclose these material facts, all of which have a tendency to mislead"). Conclusory allegations without more cannot defeat a motion for summary judgment. See Meijer, Inc. v. Biovail Corp., 533 F.3d 857, 865 (D.C. Cir. 2008).
Plaintiff's final three omissions concern the relationship between One World Fitness and Chase. As the Court has already detailed, the bank never had, nor purported to have, such a relationship. It was Bullen Wellness that signed the provider agreement and submitted charges to Chase. In such a circumstance, there is nothing misleading about Chase's not stating that One World was not an approved provider. Similarly, McMullen does not explain how Chase's failure to disclose to her that Bullen Wellness had been approved to provide chiropractic services was material or misleading. Last, as discussed above, personal-training services could be approved under ChaseHealthAdvance, so the allegation about this purported omission is unfounded.
4. § 28-3904(q)
Plaintiff's final endeavor to establish a cause of action under the CPPA rests on § 28-3904(q), which requires a merchant to "supply to a consumer a copy of sales or service contract ... or other evidence of indebtedness which the consumer may execute." Chase first attempts to tread the well-worn path that it did not need to produce any documents regarding the second line of credit because it did not exist. That, however, does not completely resolve the issue, as Plaintiff also alleges that Chase violated § (q) by not providing a signed receipt for the $1,000 charge. Setting aside that the plain language of this CPPA section mentions nothing about signed authorization, there is no dispute that Chase policy requires a customer to sign a purchase-acknowledgment form and receipt, see Provider Handbook at 6-7, and neither party has been able to locate a receipt for the $1,000 charge. ChaseHealthAdvance providers like Bullen Wellness were supposed to retain for at least four years a signed copy of every receipt. Id. at 7. If there were any disagreement about whether a customer authorized a charge, Chase would request a copy from the provider. Id."[F]ailure to deliver it promptly w[ould] require the provider to immediately refund the total amount of the transaction in accordance with the refund policy." Id. Chase avers that it never requested a receipt from Bullen Wellness because Plaintiff never submitted her dispute in writing. See Heald Depo. at 166: 18-22. Under a plain reading of the CPPA, nevertheless, Defendant's failure to produce the receipt is at least arguably a violation of § (q). The Court need not hack its way through this thicket, however, because it concludes that McMullen's proposed interpretation of § (q) is federally preempted.
Plaintiff's reading of § (q) would require that credit issuers like Chase procure and retain signed receipts whenever charges are made against a customer from a point-of-sale merchant. The bank retorts that any such obligation is preempted by the federal National Bank *311 Act. Under the Supremacy Clause, federal law may expressly or impliedly preempt state law. Implied preemption can take two forms, conflict and field preemption. Conflict preemption, the type argued here, occurs when compliance with state and federal law is impossible or where state law may "stan[d] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Barnett Bank of Marion Cty. v. Nelson, 517 U.S. 25, 31, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996) (citation omitted). The "question is basically one of congressional intent. Did Congress, in enacting the Federal Statute, intend to exercise its constitutionally delegated authority to set aside the laws of a State?" Id. at 30, 116 S.Ct. 1103. The answer here is yes. As a matter of law, therefore, Plaintiff's claim under § 28-3904(q) cannot go forward.
Barnett Bank provides a good starting point for venturing into the preemption terrain. There, the Supreme Court had to decide whether a federal law that generally permitted national banks to sell insurance in small towns preempted a state statute that expressly prohibited them from doing so. Id. at 27, 116 S.Ct. 1103. Relying on conflict preemption to hold that it did, the Court noted that the two statutes were not in "irreconcilable conflict." Id. at 31, 116 S.Ct. 1103. "Nonetheless, the Federal Statute authorizes national banks to engage in activities that the State Statute expressly forbids." Id.; see also Franklin Nat'l Bank of Franklin Square v. New York, 347 U.S. 373, 374, 74 S.Ct. 550, 98 L.Ed. 767 (1954) (holding that federal statute allowing, but not requiring, national banks to receive savings deposits preempts state statute prohibiting banks from using "savings" in advertising). The statute at issue here, the National Bank Act, empowers banks to "exercise ... all such incidental powers as shall be necessary to carry on the business of banking ... by loaning money on personal security." 12 U.S.C. § 24. Enacted in 1864, the NBA was intended to "shield[ ] national banking from unduly burdensome and duplicative state regulation." Watters v. Wachovia Bank, N.A., 550 U.S. 1, 11, 127 S.Ct. 1559, 167 L.Ed.2d 389 (2007) ; see Kennedy v. City First Bank of D.C., N.A., 88 A.3d 142, 145 (D.C. 2014) (noting that NBA is intended, in part, to "relieve national banks" from having to meet varying state-law requirements that would impede operations). "Federally-chartered banks," such as Chase, "are subject to state laws of general application in their daily business to the extent such laws do not conflict with the letter or the general purposes of the NBA." Watters, 550 U.S. at 11, 127 S.Ct. 1559. A state consumer-finance law, accordingly, is preempted if it "significantly interferes with the exercise by the national bank of its powers." 12 U.S.C. § 25b(b)(1)(B) (codifying Barnett Bank ).
Defendant argues that an interpretation of § (q) requiring it to "receive a signed authorization for each charge as a condition of lawfully extending credit would substantially interfere with [its] exercise of federally authorized lending powers." Def. MSJ at 27. Indeed, consumers frequently make purchases over the phone or electronically without providing any signed verification. Chase policy and the CPPA are not in direct conflict but, as in Barnett Bank, federal law "authorizes national banks to engage in activities that the State Statute expressly forbids." 517 U.S. at 31, 116 S.Ct. 1103. Under federal regulations, banks generally need only "make a receipt available to a consumer at the time the consumer initiates an electronic" debit or credit transaction. See 12 C.F.R. § 205.9. Most, if not all banks, comply with the regulation by requiring the point-of-sale merchant to furnish customers with receipts for credit transactions and retain a *312 copy. Requiring Chase to supply customer receipts would be unduly onerous and "significantly burden [its] exercise of its ... lending power" and could significantly disrupt the free flow of capital. Watters, 550 U.S. at 13, 127 S.Ct. 1559 ; Bank of America v. City & Cty. of San Francisco, 309 F.3d 551, 562 (9th Cir. 2002) (NBA protects banking activities that are "convenient or useful in connection with the performance of one of the bank's established activities pursuant to its express powers under the" statute) (citation omitted). Because the interpretation of § (q) that Plaintiff urges on the Court would "significantly interfere" with national banks' exercise of their powers, it is preempted by the National Bank Act. Chase is therefore entitled to summary judgment on Plaintiff's § 28-3904(q) claim.
IV. Conclusion
For the foregoing reasons, the Court grants Chase summary judgment and denies Plaintiff's Cross-Motion. A contemporaneous Order to that effect will issue this day.